UNITED STATES, Appellee

v.

JOHN S. STRINGER, Chief Engineman, U. S. Navy; LEROY LEWIS, JR., Electrician's Mate, First Class, U. S. Navy; CLIFFORD LEE SHAW, JR., Radioman First Class, U. S. Navy; and CLIFFORD R. JENKE, Electrician's Mate Second Class, U. S. Naval Reserve, Appellants

4 USCMA 494, 16 CMR 68

Nos. 3033, 3361, 3304 and 3339

Decided July 9, 1954

Jack W. Knight, Esq., Fred W. Shields, Esq., J. W. Thomas, Esq., and CDR Howard A. Patrick, USN, for Appellants.

CDR E. L. McDonald, USN, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

The accused Stringer, Lewis, Shaw, and Jenke, rated enlisted men of the submarine service, United States Navy, were charged with conspiracy to sell military property, the sale of military property, and the larceny of military property, in violation of Articles 81, 108, and 121 respectively, Uniform Code of Military Justice, 50 USC §§ 675, 702, 715. At separate trials by general court-martial, the several accused entered pleas of not guilty, but were found guilty—under various specifications of the charges—and sentenced. The convening authority approved the findings and—after some modification—sentences including bad-conduct discharges, partial forfeitures, reductions in grade, and confinement at hard labor for terms of from six to eighteen months. The several records of trial were subsequently considered by boards of review in the office of The Judge Advocate General, United States Navy, which affirmed the findings and the sentences.

At Stringer's trial timely objection to the participation of assistant trial counsel was interposed by the defense—on the ground that he had previously served as defense counsel for other persons charged with offenses arising out of the same transactions, and as an investigating officer as to those offenses. It was argued that his appearance for the Government at the trial was violative of Article 27(a), Uniform Code of Military Justice, 50 USC § 591, and paragraph 44b, Manual for Courts-Martial, United States, 1951. Following an out-of-court hearing, the law officer overruled the objection, and this ruling was affirmed by the board of review. The case was certified to us by The Judge Advocate General, United States Navy, pursuant to the provisions of Article 67(b)(2), Uniform Code of Military Justice, 50 USC § 654, upon the following question:

"Was the assistant counsel disqualified to act in this case?"

No objection to the qualifications of assistant trial counsel was raised at the trials of Lewis, Shaw, and Jenke. However, the close interrelationship of those cases with that involving Stringer, the similarity of the circumstances surrounding their prosecution, and the importance of the questions raised with

496

respect to the proper administration of military justice, all led us to approve limited grants of review to those accused as well.

## II

These are four of six cases which have been denominated unofficially the "PORPOISE affair." The following summary of pertinent facts is revealed by the records and is requisite to a proper resolution of the question presented. In 1952 all of the accused were on active duty and serving aboard the USS PORPOISE (SS-172), a Reserve Fleet decommissioned submarine, which at the time was berthed at Houston, Texas, for the purpose of providing facilities for the training of Organized Submarine Reserve personnel. An inspection of the engine room spaces by Lieutenant Masica, the officer-in-charge, on March 14, 1952, disclosed that there had been removed from the vessel the cooling coils of each of its four main engines, certain circulating and lube oil piping, sea valves, bus bar units, and other items of machinery and equipment. The cooling coils and bus bar units had been found in place during a previous inspection in January 1952, and the appearance of the spaces indicated that the equipment mentioned had been taken recently. A large amount of the missing property was subsequently discovered at various junk yards in Houston. There was abundant evidence that the accused—for a period of some four months—had been engaged in a scheme of removing equipment from the vessel, selling it for junk, and dividing the profits resulting from these transactions.

On June 7, 1952, one Holloman, who had formerly been stationed on board the PORPOISE and was suspected of having participated in the thefts, reported under orders to Eighth Naval District Headquarters at New Orleans. At that time Jenke, the accused in one of the cases with which we are concerned here, had made a confession which implicated Holloman. Upon his arrival, Holloman was informed that Lieutenant (jg) Warren R. Peterson, a law specialist attached to the headquarters legal office, was available on request if he desired counsel. His immediate request was relayed that same night to Lieutenant Peterson by Lieutenant Hugh G. Freeland, who was also attached to the legal office. When he arrived at the office shortly thereafter, Lieutenant Peterson was specifically requested by Holloman to represent him, and the former agreed to do so.

He also learned from Lieutenant Freeland that there was some possibility that Holloman could obtain a grant of immunity, provided he would agree to testify for the Government and against others involved in the thefts. Following a privileged conversation, during which he reported to Lieutenant Peterson certain of the facts of which he had knowledge, Holloman was informed of the possibility of obtaining immunity and advised by Lieutenant Peterson to accept the offer. Holloman agreed to do so, and with his consent certain notes, taken by Lieutenant Peterson during the course of the privileged conversation, were surrendered to the prosecution. On June 12, 1952, Holloman received a grant of immunity and subsequently testified for the Government in all of the cases at bar. No charges were brought against Holloman at any time, nor did Lieutenant Peterson participate as his counsel in any trial or other formal proceeding.

Lieutenant Peterson was also instrumental in obtaining immunity for one Jordan, another of the crew suspected of involvement in the thefts under scrutiny. Some three months before the trials of the present cases, Jordan had been tried by special court-martial under a charge of misprision of felony growing out of the unauthorized removal of equipment from the PORPOISE. He was sentenced to forfeit $50 per month for three months and to be reprimanded—and this sentence received the approval of the supervisory authority, although deemed inadequate. On September 16, 1952, Jordan was granted immunity from further prosecution and subsequently testified for the Government at the trial of the accused, Stringer.

In addition, the records disclose that, prior to the trial of the accused in the

**497**

cases at bar, Lieutenant Peterson had served as defense counsel for Lieutenant Masica, the officer-in-charge, and had participated as his attorney at a pretrial hearing in New Orleans. At the time of the present trials, it was contemplated that Lieutenant Masica would be tried by general court-martial, although specific charges had not been preferred. Lieutenant Peterson had been designated as defense counsel in that expected proceeding, and proposed to serve in that capacity. By way. of supplement to the record facts summarized above, defense counsel state in their briefs that Jordan had pleaded guilty on trial by special court-martial, and that Lieutenant Peterson had appeared as his defense counsel. They also assert that—following the trials of the cases before us now—Lieutenant Peterson in fact served as defense counsel for Lieutenant Masica, who was charged with dereliction of duty and with permitting Government property to be wrongfully disposed of, and that the latter was acquitted in that proceeding.

Pretrial investigations in the present cases—pursuant to the provisions of Article 32, Uniform Code of Military Justice, 50 USC § 603—were conducted by Lieutenant Commander George T. Boland. When the causes had matured for trial, Lieutenant Peterson was designated in the appointing order as assistant trial counsel in the cases of Stringer, Lewis, and Shaw; and Lieutenant Freeland was similarly named in the case of Jenke. Objection to the qualifications of the former officer is based upon the dual ground that he had previously acted for the defense and also as an investigating officer—while objection to Freeland is based solely on the ground that he had acted as investigating officer. Our grant of review in the Lewis and Shaw cases was phrased to coincide with the question certified as to Stringer by The Judge Advocate General, United States Navy —while our grant in the Jenke case limited review to the question of whether Freeland, the assistant trial counsel there, was disqualified by reason of prior participation as an investigating officer.

**498**

III

Before turning to the consideration of the basic issues involved, we note a procedural objection raised by the Government. Counsel insist that no question regarding the qualifications of assistant trial counsel is properly before this Court in the Lewis, Shaw, and Jenke cases because no objection was taken at trial. Thus—it is argued— the matter must be deemed waived, and may not be urged for the first time at the peak of appellate review. The force of this argument is somewhat attenuated by reason of the identity of counsel—save in the instance of Jenke —and the similarity of surrounding circumstances in the Stringer case, where timely objection was made. Moreover, it is the position of the defense that the participation of assistant trial counsel in these cases so violated the fundamental right of the accused to a fair trial as to necessitate reversal in the interests of justice—and despite failure to object at the trial.

True it is that a majority of this Court has adopted and followed the rule announced by Federal courts that an appellate tribunal will not consider errors alleged for the first time on appeal. United States v. Fisher, 4 USCMA 152, 15 CMR 152; United States v. Henry, 4 USCMA 158, 15 CMR 158. However, there exist two well defined and widely recognized exceptions to this rule. One is to the effect that an appellate court may take cognizance of clear error not assigned—that is, error apparent on the face of the record and sufficiently prejudicial as to one or more of the parties as to preclude application of the doctrine of harmless error. Under the other, an appellate court, in criminal cases, may consider claimed error which would result in a manifest miscarriage of justice, or would otherwise "seriously affect the fairness, integrity, or public reputation of judicial proceedings." See United States v. Atkinson, 297 US 157, 80 L ed 555, 56 S Ct 391. While a due regard for the proper and orderly administration of justice constrains us to emphasize the duty of counsel to make seasonable objection at the

trial, it is clear that we may consider error—first urged on appeal—which is alleged to violate due process of law and deny to an accused the substance of a fair trial.

## IV

We shall examine first the contention that assistant trial counsel were disqualified to act in these cases because of prior participation as investigating officers. This is a ground of objection common to all of the cases at bar, and is based exclusively on the events which transpired on the night of June 7, 1952, involving Lieutenant Freeland, Lieutenant Peterson, and Holloman. At this date no formal charges had been brought against any of the accused, nor had any sort of appointing order been promulgated naming either Freeland or Peterson as assistant trial counsel.

Article 27(a), of the Uniform Code, supra, deals with the appointment and qualifications of counsel in court-martial cases, and its pertinent provisions provide:

" . . . No person who has acted as *investigating officer,* law officer, or court member in any case shall act subsequently as trial counsel, assistant trial counsel, or, unless expressly requested by the accused, as defense counsel or assistant defense counsel in the same case. No person who has acted for the prosecution shall act subsequently in the same case for the defense, *nor shall any person who has acted for the defense act subsequently in the same case for the prosecution.*" (Emphasis supplied.)

The term "investigating officer" is not defined in Article 27(a), nor in any other Article of the Code. However the Manual, supra, paragraph 64, purports to define the phrase in the following language:

"Within the meaning of the fifth clause of 62f and Articles 25d(2), 26a, and 27a, the term 'investigating officer,' as applied to a particular offense, shall be understood to include a person who, under the provisions of 34 and Article 32, has investigated that offense or a closely related offense alleged to have been committed by the accused. The term also includes any other person who, as counsel for, or a member of, a court of inquiry, or as an investigating officer or otherwise, has conducted a personal investigation of a general matter involving the particular offense; *however, it does not include a person who, in the performance of his duties as counsel, has conducted an investigation of a particular offense or a closely related offense with a view to prosecuting or defending it before a court-martial.*" (Emphasis supplied.)

Article 32(a) of the Code, supra, provides in part:

"No charge or specification shall be referred to a general court-martial for trial until a thorough and impartial investigation of all the matters set forth therein has been made."

See also, Manual, supra, paragraph 34. In the instant cases pretrial investigations under the provisions of this Article were conducted by Lieutenant Commander Boland, and it is in no way contended that either Freeland or Peterson also investigated charges against the accused within the meaning of Article 32.

We have had occasion before to construe the portions of the Uniform Code of Military Justice set out above. In United States v. Lee, 1 USCMA 212, 2 CMR 118, we pointed out:

"It is distinctly arguable that the functionary whose duty it is to conduct the investigation considered in the preceding paragraph, (Article 32) and who is always characterized as 'the investigating officer,' is the only official contemplated by the use of the term in the caveat contained in Article 27(a). This is true notwithstanding the fact that the same phrase is popularly—and in some instances officially—applied in the military service to any officer designated by higher authority to conduct an investigation into matters of command interest, regardless of their connection with disciplinary affairs or military justice. It will be observed that the prohibitory language of Ar-

ticle 27(a) used in this connection specifically links (1) the investigating officer, (2) the law officer, and (3) the court member; refers to no other official; and provides that no person who has acted as such 'in any case' shall act subsequently in certain named capacities including the position of trial counsel 'in the same case.' By way of analogy the suggested implication is made equally clear in Article 25(d)(2) which deals with a related problem in which isolation from prior contact with the details of a court-martial proceeding is perhaps of even greater importance. There it is provided that:

'No person shall be eligible to sit as a *member* of a general or a special court-martial when he is the accuser or a witness for the prosecution or has acted as *investigating officer* or as counsel *in the same case*.' (Italics supplied.)

"However this may be, the Manual in paragraph 64, previously set out herein, takes a broader view of the content of the term 'investigating officer,' as used in Article 27(a). Analysis of this paragraph suggests that the following persons shall be deemed to be included within the phrase's meaning:

(1) One who has investigated the offense in question or a related offense under the provisions of Article 32.

(2) One who has served as a member of or as counsel for a court of inquiry and as such has conducted a personal investigation of a general matter involving the offense in question.

(3) One who as 'investigating officer'—acting other than under Article 32 apparently—has conducted a personal investigation of a general matter involving the offense in question.

(4) One who has 'otherwise' conducted such a personal investigation."

It is the position of appellate defense counsel that on the night of June 7, 1952, Lieutenant Freeland and Lieutenant Peterson—as investigating officers or otherwise—"conducted a personal investigation of a general matter" involving the particular offenses here in question. Because of this—the argument continues—both are investigating officers within the meaning of Article 27(a), through paragraph 64 of the Manual, and as such disqualified to serve as assistant trial counsel in the cases at bar.

As to Lieutenant Freeland, this contention is quite without record foundation. Concerning his activities on the night in question, it appears that his contact with Holloman was limited to relaying the latter's request for counsel to Lieutenant Peterson, who—Holloman testified—had been recommended to him. There is no evidence that the former officer interrogated Holloman. On the contrary, Peterson testified that Freeland—after mentioning the possibility of a grant of immunity—stated that he was reluctant to discuss the matter with Holloman because "the question of privileged conversation" might arise if the grant did not receive approval. There is nothing in the record to suggest that Lieutenant Freeland conducted an investigation of any nature in these proceedings prior to his appointment as assistant trial counsel. Rather, it is apparent from his deportment on the night in question that he had reason to believe that he might be appointed trial counsel in the event formal charges were brought and, with this possibility in mind, merely obtained for Holloman the counsel he had requested.

We cannot see that these facts justify the conclusion that Freeland conducted a personal investigation of the instant offenses, or one into a general matter involving them, in the capacity of investigating officer or otherwise. This conclusion necessarily vitiates the claim of the defense that Peterson was assisting Freeland in the conduct of an investigation. The former testified that, until the night of June 7, he had "nothing to do with the PORPOISE case" and was "unfamiliar with the facts of that case or cases." It is manifest that, in

500

examining Holloman concerning his knowledge of the matter, he was acting as counsel for Holloman, and attempting to discover the nature of his client's situation and the extent of his information—with a view to advising him and recommending a course of action. The fact that he had been previously informed of the possibility of Holloman's obtaining immunity in no way detracts from this conclusion. Notwithstanding this, defense counsel maintain that, in ascertaining the extent of Holloman's knowledge, Lieutenant Peterson was conducting an investigation of a general matter involving the offenses of which the accused were convicted.

We are not impressed by this argument. It will be noted that, in the terminal portion of paragraph 64 of the Manual, care was taken to exclude from the definition of "investigating officer" both trial and defense counsel who necessarily must conduct an investigation into the facts of a case in the performance of their duties as such. While it is arguable that this provision was not meant to become operative until charges had been filed, we perceive no compelling reason why its application should be thus limited for the present purpose. Nor can we discern why one who—as personal counsel—interrogates a suspect and later obtains immunity for him, should either receive or be denied the protection of its language in terms of the precise date of the filing of formal charges. And our view in this particular is unaltered by the fact that, in thus interviewing Holloman, Lieutenant Peterson may not have conformed to the usual military practice. See SECNAVINST 5800.3A, 4 Jan 1954, paragraph 12a; AR 600–103, paragraph 10b, 29 June 1951.

However this may be, it is clear that some degree of differentiation was intended between those who make inquiries *qua* investigators and those who do so in the performance of their duties as counsel. Certainly it cannot be urged successfully that one who acts as assistant trial counsel is not to be permitted access to the facts until the accused has been formally charged. As a general proposition this contention was laid to rest in definitive fashion by our decision in the Lee case, supra, where it was held that an accuser, who had made a preliminary investigation prior to the signing of charges, was not disqualified to serve as trial counsel. We are therefore of the opinion that the inquiry conducted by Lieutenant Peterson in this instance did not constitute him an investigating officer, within the meaning of paragraph 64 of the Manual, and thus disqualify him as assistant trial counsel.

## V

We next consider the question of whether Lieutenant Peterson was disqualified to serve in the prosecutions of Stringer, Shaw, and Lewis because he had previously acted for the defense in the same case, within the purview of Article 27(a). The position of the accused that he was so disqualified is based on the following facts: (1) That, prior to the instant trials, he had served as counsel for Jordan and Holloman, both of whom were suspected of complicity in the unauthorized removal of equipment from the PORPOISE. (2) That he also represented Lieutenant Masica during a pretrial examination, and proposed to act as his defense counsel at the impending court-martial trial. Counsel for the accused argue that the situations involving Lieutenant Masica, Holloman, and Jordan were so closely connected with those present in the cases at bar that they must be regarded as "the same case."

The principles underlying the relevant portion of Article 27(a) are fundamental in the law and have been discussed frequently by courts and other authorities. The exclusion predicated in the Article adopts for the military establishment those basic precepts of the civilian law to the effect that a lawyer must not represent conflicting interests, nor permit himself to be placed in such a position that he may be required to choose between such interests. See Silbiger v. Prudence Bonds Corporation, 180 F2d 917 (CA2d Cir); Strong v. International Building, Loan & Inv. Union, 183 Ill 97, 55 NE 675;

2 RCL 974, paragraph 51; Anno., 51 ALR 1307. In both civil and criminal cases the civilian courts have been concerned primarily with preserving the confidential relationship between attorney and client and avoiding all possibility that counsel may utilize against former clients privileged information received by reason of this relationship. People v. Gerold, 265 Ill 448, 107 NE 165; Ferguson v. Alexander, (Tex Civ) 122 SW2d 1079; 27 CJS District and Prosecuting Attorneys, § 12(3). Moreover, with respect to prosecuting attorneys, the quasi-judicial nature of their office renders impartiality of paramount importance. United States v. Valencia, 1 USCMA 415, 4 CMR 7; State v. Tate, 185 Iowa 1006, 171 So 108. Thus it has been held repeatedly that a prosecuting attorney must stand indifferent as between the accused and any private interest, People v. Gerold, supra; and that a personal interest in obtaining an acquittal or a conviction in a given case serves to disqualify him. State v. Nicholson, (Mo App) 7 SW2d 375, 378; People ex rel Colorado Bar Ass'n v. ——, Attorney at Law, 90 Colo 440, 9 P2d 611; State v. Tate, supra.

Although these principles have often been expounded, resort to the authorities furnishes but slight assistance in the solution of specific problems. The question of the disqualification of attorneys and prosecutors has arisen against such a variety of factual backgrounds that no general rule may be laid down —and the courts are in substantial accord that the solution of the problem must necessarily depend on the facts and circumstances of the particular case. Thoreson v. State, 69 Okla Crim 128, 100 P2d 896; Gottwals v. Rencher, 60 Nev 35, 98 P2d 481; Logan v. Logan, 97 Ind App 209, 180 NE 32. The critical inquiry in criminal cases, centers normally, of course, on the possibility that the accused may be prejudiced by the presence of a personal interest in the outcome of the case on the part of the prosecutor, or the latter's possession of privileged information, or an intimate knowledge of the facts by reason of a professional relationship with the accused. If—after a consideration of all the circumstances —the possibility of prejudice may be said to exist, the prosecutor must be disqualified, and refined calculations as to the precise quantity of prejudice existing, or its probable effect on the results of the trial, are not to be indulged.

With these criteria in mind, we turn to an examination of the facts of the cases at bar. Since Lieutenant Peterson did not serve as counsel for these accused, no contention is—or could be— made that he was in a position to violate confidential relationships, or to utilize privileged information, against them. Moreover, there is nothing in the records to show that his activities in behalf of Jordan, Holloman, and Lieutenant Masica provided him with an intimate knowledge of the facts upon which the present prosecutions were based, which knowledge would not otherwise have been available to representatives of the Government. Both Jordan and Holloman were granted immunity and became Government witnesses. The notes, taken by Lieutenant Peterson during his interview with Holloman on the night of June 7, were promptly surrendered to the prosecution with Holloman's consent. Masica was not involved in the thefts, and willingly testified for the Government concerning the circumstances surrounding his inspection of March 14, and his discovery of the loss. It is clear that Peterson could have had no greater knowledge of the facts in these cases than that possessed by other members of the prosecution, and that the Government's position in this respect would have been exactly the same had someone other than himself served as assistant trial counsel. Nor do we find data on which to base a belief that any personal interest in the results of the trials may be fairly imputed to Lieutenant Peterson.

The immunity granted Jordan and Holloman became absolute on their furnishing testimony, and was not conditioned on the Government's success in obtaining convictions based thereon. Lieutenant Masica was not at all suspected of complicity in the thefts. Indeed—as defense counsel stated during the out-of-court hearing on the motion to disqualify Peterson—"all the evi-

dence adduced in previous records is that Lt. Masica did not participate in any thefts aboard the PORPOISE, but was apparently without knowledge that such was going on." We can conceive of no reason—nor has any been suggested—why the conviction of the accused before us here would have any bearing on the positions of Jordan, Holloman, or Masica. On the whole, the record reflects literally nothing tending to show either that Lieutenant Peterson's frame of reference concerning these cases could have been expanded in any way by the acquisition of otherwise unavailable information, or distorted by the pressure of a personal interest in the outcome of the trials. This failure to discern any sort of possibility that the accused can have been prejudiced by Peterson's service as assistant trial counsel indicates strongly that the situations in which he served as counsel for Jordan, Holloman and Masica—related though they are—do not constitute "the same case" as those at bar, within the meaning of Article 27(a).

The pertinent portion of Article 27 (a), set out above, forecloses the position of counsel here with respect to one who has "acted for the defense . . . *in the same case."* (Emphasis supplied.) Further in this connection, the Manual, supra, paragraph 44b, provides:

"Whenever it appears to the court or to the trial counsel himself that any member of the prosecution named in the appointing order is for any reason, including misconduct, bias, prejudice, hostility, *previous connection with a particular case,* or lack of legal qualifications (for general courts-martial), disqualified or unable properly and promptly to perform his duties, a report of the facts will be made at once to the convening authority and appropriate action taken to insure that the disqualified member shall not act for the prosecution." (Emphasis supplied.)

It thus appears that trial counsel may be disqualified for having acted for the defense in the *same* case, or because of a previous connection with a *particular* case. By way of contrast, the

Manual, in paragraph 62f(13), provides that a *member,* or the *law officer* of a general court-martial, may be challenged for cause on the ground "that he participated in the trial of a *closely related* case." (Emphasis supplied.) It would seem that, if the draftsmen of this provision had intended that *trial counsel* be disqualified because of prior participation in a *related* case, they could easily have prescribed to that effect. Yet nowhere in the Manual does it appear that trial counsel are thus disqualified.

We are not unmindful of the decisions of boards of review in United States v. Mace, 5 CMR 610, and United States v. Homan, 6 CMR 504. Nevertheless—consistent with what we have said heretofore—we consider that these holdings must be confined to the specific factual situations presented in them. In the former case, counsel for the defense at the trial of a single accused person subsequently served as trial counsel during a rehearing of the identical matter. In the latter case, three accused airmen were associated in, and charged with, the commission of a single larceny, but tried in two separate trials. One of the accused—whose case could well have been consolidated with the others—was defended by counsel who prosecuted the remaining two before another court-martial on the following day. In both cases trial counsel were held disqualified.

While we take no exception to these decisions, we conceive them to be readily distinguishable from the cases at bar. Since the Mace case involved defense counsel at a first trial serving as trial counsel on a rehearing of the identical charges against the selfsame accused, it obviously falls within the scope of the prohibition contained in Article 27(a). The situation presented in the Homan case is likewise fraught with possibilities of serious prejudice to the accused. Where—at an actual trial—counsel has conducted the defense of one charged with the commission of the *same* offense charged against the accused, it is impossible to determine to what extent he has been influenced thereby, or whether he is thereafter capable as trial counsel of conducting

the prosecution of the accused in an impartial manner. If the previous defense had proved unsuccessful and had resulted in a conviction of the coaccused, counsel might well be motivated to seek a similar conviction of the accused at any cost. On the other hand, if the coaccused has been acquitted at the former trial, there might also be an improper inclination on the part of counsel to justify this result by obtaining a conviction of the accused. In either case, personal considerations tending to result in overzealous prosecution and subordination of the demands of impartiality might well influence his conduct of the trial.

Moreover, in previously representing at an actual trial one charged with the identical offense charged against an accused, it is clear that counsel has participated in a common defense with that accused. In preparing the defense for the coaccused, counsel may well have entered into consultation with the accused, or his legal representative, concerning the circumstances surrounding the commission of the offense. In doing so, he could hardly fail to obtain privileged information from the accused or his counsel—by reason of his confidential relationship with the coaccused—which would prejudice the defense of the accused. Even in the absence of a showing that trial counsel has had access to such information from the accused because of his professional relationship with one similarly charged, we would be inclined to condemn his participation in the subsequent prosecution of accused.

In the military system, the Government is required to furnish counsel for an accused who is unable or does not wish to retain individual civilian counsel. Defense counsel is obliged to represent his client to the best of his ability—and, in the absence of a showing to the contrary, must be presumed to have done so. In a situation of this nature, defense counsel would necessarily elicit from his client numerous relevant facts and circumstances pertaining to the general matter on which the charges are based. Where several defendants are to be tried on the same charges but at separate proceedings,

**504**

it must be deemed impermissible for the Government to strengthen its position with respect to the prosecution of some of the accused persons by appointing an officer to defend one and subsequently selecting him to prosecute the remainder. In the absence of a willingness on the part of one of the several accused to divulge information in return for preferential treatment, the Government would thus be utilizing its obligation to provide defense counsel in such a manner as to enhance its chances of obtaining convictions in subsequent prosecutions.

As we have pointed out earlier, considerations of this sort do not at all obtain in the cases at bar. Jordan, Holloman, and Lieutenant Masica were not tried for—or even so much as charged with—the offenses in question here. Both Jordan and Holloman made full disclosure of their knowledge of the crimes, and Lieutenant Masica's information was at all times available to the Government. The record is devoid of any sort of indication that Lieutenant Peterson at any time entered into discussions of a confidential nature with the present accused or their counsel, or enjoyed the slightest professional contact with them. With respect to the necessity for choosing between conflicting interests, or the possibility of having obtained information which would be privileged or otherwise unavailable to the Government, the instant situation is quite unlike that considered in the Homan case.

Moreover, the possibility that the trials in these cases might not have been conducted with complete fairness and impartiality on the part of the Government is precluded, in part at least, by the fact that Lieutenant Peterson served only in the capacity of assistant trial counsel. The control of the prosecution was at all times in the hands of Commander John D. Moroney, who acted as trial counsel, had no previous connection with any person suspected of complicity in the affair, and against whose participation no objection was made. On the contrary, in the Homan case, both trial counsel and assistant trial counsel at the second trial had previously served in the same rela-

tive positions on the defense staff in the proceedings against the coaccused. Indeed, we wholly agree with the view expressed in that case to the effect that a narrow construction of the phrase "in the same case" would subvert the manifest intent of the statute. However, we are of the opinion that, when one or more occurrences give rise to a variety of charges against a number of individuals, the mere showing that an officer has acted in some manner as counsel for certain of the prospective defendants does not—*without more*—disqualify him to serve as assistant trial counsel in the prosecution of others.

But is there more here? This brings us to a consideration of the possibility of specific prejudice—that is, prejudice directly operating against the accused in these cases arising from the connection of Lieutenant Peterson with their trial. At the hearing, counsel for the accused stated that his objection "was not based on any bias, prejudice, misconduct, hostility or anything of that nature" on the part of assistant trial counsel. Moreover a diligent search of the records reveals that no reversal of these proceedings could possibly be predicated on those grounds. There is abundant evidence of the guilt of the accused, including multiple voluntary confessions, signed receipts from various junk dealers concerning the equipment taken, and personal identifications of certain of the accused who made the sales. There is also no slightest indication of improper conduct on the part of Lieutenant Peterson. The trials were conducted in a distinctly fair and impartial manner, and the records are wholly devoid of suggestion that the accused were, or could have been, prejudiced by the fact that the assistant trial counsel had formerly served in one way or another as counsel for Jordan, Holloman, and Lieutenant Masica.

We thus conclude that assistant trial counsel had not acted for the defense "in the same case," within the scope of Article 27(a). In so holding we have no apprehension that—as defense counsel imply—our decision may be interpreted to mean that one may serve indiscriminately as defense counsel and trial counsel in cases involving coconspirators tried separately under identical charges. That situation is not here presented, and nothing we have said is intended to lend support to such an assertion. See United States v. Homan, supra. As we have pointed out earlier herein, no general and inflexible rule separating "the same case" from a "related case" can be laid down. Only through a case by case process may a line of demarcation be delineated.

## VI

A final point raised by the Government deserves but scant consideration. It is implicit within Government contentions that in our solution of the cases at bar we have improperly taken judicial notice of records not before the court. Our setting the cases in such a way that they were heard together obviates extended discussion of this point. Suffice it to say that—when read together—the several records before us amply reflect the pertinent facts summarized in an early portion of the opinion.

It follows from what has been said that assistant trial counsel were not disqualified to serve in these cases—and thus the question certified in the Stringer case is answered. The decisions of the boards of review are, in all cases, affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I concur in the conclusion that neither Lieutenant Peterson nor Lieutenant Freeland were investigating officers within the meaning of Article 27(a), Uniform Code of Military Justice, 50 USC § 591, and therefore, were not disqualified for that reason for participating in the prosecution.

I dissent from that portion of the majority opinion which holds that Lieutenant Peterson was not disqualified from participating in the prosecution of the accused, Stringer, Lewis, and Shaw, on the basis of his prior representation of Holloman and Jordan and

**505**

his prospective representation of Lieutenant Masica.

The majority has correctly concluded that the pertinent portion of Article 27(a), supra, refers to and is based upon the "conflict of interests" restriction imposed upon civilian attorneys before civilian tribunals. The same general objective which this restriction serves in the civilian sphere characterizes its military counterpart. This salutary prohibition is designed to assure every defendant an absolutely fair trial, and, as far as possible, to insure against even a suspicion of improper motivation attaching to any person taking part in the administration of military justice.

Describing the civilian "conflict of interests" rule, the Supreme Court of Illinois declared:

" . . . The rule has long been firmly established that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties. . . . This rule is a rigid one, designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties. He should undertake no adverse employment, no matter how honest may be his motives and intentions. . . . The administration of the law should be free from all temptation and suspicion, so far as human agencies are capable of accomplishing that object, and public policy strongly demands that one who has been employed on one side should not be permitted to appear on the other side." [People v. Gerold, 265 Ill 448, 107 NE 165. To the same effect, see Silbiger v. Prudence Bonds Corporation, 180 F2d 917 (CA2d Cir); Strong v. International Building, Loan & Inv. Union, 183 Ill 97, 55 NE 675.]

In reviewing an allegation of improper interest on the part of a district attorney, the Supreme Court of Missouri, in State v. Nicholson, (Mo), 7 SW2d 375, stated:

"It is much more desirable to retain confidence in the purpose of the courts and other officers to enforce the law by fair and just means than to try to secure convictions in all cases at all hazards."

It is true, as indicated by the majority, that civilian appellate courts resolve problems of conflicting interests on the basis of the facts of each case. But no such problem confronts military courts when faced with the type of situation delineated in Article 27(a), supra. That Article provides:

"No person who has acted for the prosecution shall act subsequently in the same case for the defense, nor shall any person who has acted for the defense act subsequently in the same case for the prosecution."

The question before us is: "Did Lt. Peterson, the assistant trial counsel, act for the defense in the same case?" The majority have concluded that the phrase "in the same case" cannot be narrowly construed without doing violence to the clear intent of Congress. Thus, in resolving the question, we are required to examine the charges in these cases and the facts upon which they are predicated, rather than merely the names and the docket numbers thereof.

The accused Stringer was charged with nine separate conspiracies to sell military property of the United States. Each of these specifications describe Holloman as a coconspirator and as a participant in the overt acts necessary to the establishment of the crimes. In three specifications Holloman is the only coconspirator named. In two of them he is described as the sole perpetrator of the overt acts. The other charges against Stringer allege nine separate larcenies of Government property and nine instances of wrongful sale of the same property. Each of the latter offenses grew out of the nine conspiracies.

In the Shaw case, Holloman is described as a coconspirator in each of the four conspiracy specifications and as a participant in the necessary overt acts. In two of them he is the only coconspirator named. The charges against the accused Lewis follow the same pattern. Consequently, with sev-

enteen specifications of conspiracy before us, we find Holloman a party to the unlawful combination, and a participant in the overt acts in every single instance. Indeed, were it not for his participation in six of these instances, there could have been no conspiracy. Were it not for his activities on the two occasions affecting his overt acts alone, neither conspiracy, larceny, nor wrongful sale could have been maintained against the accused.

These conspiracies, and the substantive crimes arising out of them, were the subject of the investigation which required Holloman's transfer from Norfolk, Virginia, to the 8th Naval District Headquarters, New Orleans, Louisiana. It was in connection with these crimes that Lieutenant Peterson was assigned as his defense counsel before charges were preferred against any of the principals. His disclosure of the circumstances surrounding the crimes to his counsel and the subsequent communication of these facts, with his consent, to the convening authority directly resulted in charges against the others and immunity for himself. In this particular, it is significant to observe that Holloman's immunity was granted on June 12, 1952. The charges against Stringer and Lewis were preferred on the same date and those against Shaw on June 25, 1952. Under the circumstances it is obvious that the crimes of which Holloman was originally suspected, and concerning which Lieutenant Peterson was assigned as his defense counsel, were the identical crimes of which these accused now stand convicted. If the phrase "in the same case" has any meaning at all, it fits this situation to a "T." Consequently, the appointment of Lieutenant Peterson as assistant trial counsel, and his participation in the prosecution of the charges against Stringer, Lewis, and Shaw, violated a clear mandate of Congress designed to protect the integrity of the court-martial system. Prejudice resulted as a matter of law. These convictions should be reversed, however pure Lieutenant Peterson's motives may have been.

The majority very correctly declares that:

" . . . In a situation of this nature, defense counsel would necessarily elicit from his client numerous relevant facts and circumstances pertaining to the general matter on which the charges are based. Where several defendants are to be tried on the same charges but at separate proceedings, it must be deemed impermissible for the Government to strengthen its position with respect to the prosecution of some of the accused persons by appointing an officer to defend one and subsequently selecting him to prosecute the remainder."

The basis of the rule is the protection of the integrity of the court-martial system, for otherwise "the Government would thus be utilizing its obligation to provide defense counsel in such a manner as to enhance its chances of obtaining convictions in subsequent prosecutions."

After propounding the rule the majority seeks to avoid its effect by limiting its application to cases in which trial counsel has appeared for the defense in an actual trial of one similarly charged. Such a limitation presents merely a distinction without a difference. Here, Holloman was transferred from Norfolk, Virginia, to New Orleans, Louisiana, for investigation of certain criminal activities of which he was suspected. Although there was no obligation upon the Government to supply defense counsel at this point, Lieutenant Freeland, its representative, suggested to Holloman the advisability of securing counsel, and recommended the selection of Lieutenant Peterson. He explained this suggestion to Lieutenant Peterson by saying that he did not want to create a confidential relationship with Holloman by discussing the case with him. However, he carefully pointed out that if Holloman knew enough about the crimes under investigation, and was willing to testify against the others involved, he might be given immunity. Thus, it is clear that Peterson's role as defense counsel was assigned to him not in the interests of Holloman, his client of the moment, but solely "to enhance . . . [the Government's] chances of obtaining convictions in sub-

sequent prosecutions." How well he discharged his duties may be gauged by the fact that after his first interview with Holloman, the Government was ready to proceed with the trials of the others. One might well ask "Just who was Lieutenant Peterson's client?"

As the ostensible counsel for Holloman (the only conspirator who participated in every one of the conspiracies charged), Lieutenant Peterson obtained from his client the most complete information concerning the offenses alleged in the Stringer, Lewis, and Shaw cases. Armed with this intimate knowledge of the facts upon which the present prosecutions were based, he proceeded to represent the Government, and sustained the Goverment's position through the testimony of his client Holloman. It would be hard to imagine a clearer case of the appointment of a defense counsel to enhance the chance of obtaining convictions in subsequent prosecutions. According to the rule laid down by the majority, he was disqualified.

Examining the facts further, it is plain that from this dual role prejudice resulted to each of the accused. It is axiomatic that trial counsel, coming into possession of facts favorable to an accused, should either present them to the court or, at the very least, disclose them to the defense. During the course of the trial of these cases had Lieutenant Peterson discovered information tending to discredit Holloman or weaken his credibility, would he impeach his own client who testified upon his recommendation? Or would he withhold the information until he was ready to defend Lieutenant Masica, and then seek to destroy the Government's case by impeaching its principal witness? While the record of Lieutenant Masica's trial is not before us, and we know nothing of the facts presented to the court in that case, it is highly significant that Lieutenant Masica, represented by Lieutenant Peterson, was acquitted of the charges against him. The above questions clearly indicate to any person familiar with trial tactics, the dangers which flow from such conduct; and the mere fact that they can arise demands the disqualification of anyone to whom they even remotely apply.

"This rule is a rigid one, designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties." [People v. Gerold, supra.]

Lieutenant Peterson's representation of Jordan, named as a coconspirator with Holloman and Stringer in two of the conspiracy specifications, standing alone, would require reversive action. When added to the fact that as assistant trial counsel he also represented Holloman, his participation in the prosecution of these cases cannot be either overlooked or condoned.

Accordingly, I would reverse the convictions in the Stringer, Lewis, and Shaw cases and remand them for a rehearing. However, since this error does not affect the Jenke trial, that conviction should be affirmed.