## UNITED STATES

v.

**Carl Wayne DURNEN, 380 76 7645, Aviation Machinist's Mate Airman (E–3), U. S. Navy.**

**NMCM 81 0495.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 15 Aug. 1980.

Decided 19 April 1982.

LT Thomas P. Murphy, JAGC, USNR, Appellate Defense Counsel.

Howard I. Denike, Esq., Individual Civilian Counsel.

LT Wm. Eric Minamyer, JAGC, USNR, Appellate Government Counsel.

Before GLADIS, Senior Judge, and BOHLEN and BYRNE, JJ.

BYRNE, Judge:

Appellant was convicted, contrary to his pleas, by a general court-martial, of one specification of rape in violation of Article 120 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. He was sentenced by a members court to be discharged from the naval service with a bad-conduct discharge, to be confined at hard labor for eight years, and to be reduced to pay grade E–1. The supervisory authority approved the sentence but suspended all confinement in excess of three and one half years.

The only focus of the appellant's defense in oral argument before this Court was that the trial counsel was disqualified from participating in the prosecution of the accused.

Appellant primarily relies upon two precedents to support his argument: *United States v. Stringer*, 4 U.S.C.M.A. 494, 16 C.M.R. 68 (1954), and *United States v. Fowler*, 6 M.J. 501 (A.F.C.M.R.1978). We consider these cases to be distinguishable.

Both *Stringer, supra*, and *Fowler, supra*, look to Article 27(a) of the UCMJ, 10 U.S.C. § 827(a): "... No person who has acted for the prosecution may act later in the same case for the defense, nor may any person who has acted for the defense act later in the same case for the prosecution."[1]

We conclude that there was *no* privileged communication between Legalman Chief R. and the appellant, and that, even if there was, *no* attorney-client relationship between the trial counsel, Lieutenant S., and the appellant was created. In any event, the doctrine of waiver is applicable.

During January of 1980, the accused visited a Naval Legal Service Branch Office seeking legal assistance. He advised the receptionist that he was inquiring about a divorce. The receptionist referred the appellant to Legalman Chief R., because his situation appeared to qualify for a California Summary Dissolution of Marriage. Legalman Chief R. provided a booklet, which the appellant read, and responded to general questions such as the location of forms, etc. No legal advice was provided. The rape occurred on 18 February 1980. The trial counsel, Lieutenant S., apparently learned of the visit by virtue of a gratuitous remark by Legalman Chief R. Legalman Chief R. told the trial and defense counsel what transpired between himself and the appellant when they inquired. At the Article 32, 10 U.S.C. § 832 investigation the trial counsel elicited from the appellant's wife (appellant's key alibi witness), that the couple had been considering a divorce in 1980, but rejected it.[2] At trial, appellant stated, on direct examination, that he and his wife had considered a divorce (because of career differences), but rejected it. (R. 126–127.) His wife confirmed that fact on her direct examination, (R. 150), after she had testified that during the time of the offense, (between 1900 and 1929), her husband was working on his car and policing his carport area. On the wife's cross-examination the trial counsel elicited, without objection, that at the Article 32 investigation, she had initially denied their marriage had any problems, but had recanted under cross-examination. (R. 156.)

## A

### Privileged Communication

■■ The affidavits presented by appellate defense state that there were two paths a serviceman or servicewoman requesting legal assistance could travel when visiting a legal assistance office. The path taken was, in each case, initially determined by the receptionist at the legal assistance office. One course, the "usual" way, led to one of four lieutenants, (including Lieutenant S.) who rotated their legal assistance duties. The other route led to Legalman Chief R., when the situation appeared to

---

1. *See also* paragraphs 44*b*, 61*e*, *Manual for Courts-Martial, 1969 (Rev.)*.

2. The cross-examination of the appellant's wife at the Article 32 investigation indicates that the trial counsel knew that the appellant and his wife were having marital problems. However, the record also warrants the conclusion that the marital difficulties could have been developed under skillful cross-examination in any event.

meet the legal prerequisites for proceeding under the California Summary Dissolution laws. This *latter* route is the one the appellant travelled, that is, he was referred to Legalman Chief R. for technical assistance, rather than for an attorney's advice. Consequently there was no "attorney" upon which to base an attorney-client relationship. Further, communications made to a legalman for the purpose of obtaining the legalman's advice (as in this case) are not privileged. *Cf. Hawes v. State*, 88 Ala. 37, So. 302 (1890). Cited in *C. Torcia, Wharton's Criminal Evidence* § 559 n.27 (13th ed. 1973).[3]

**3.** In *Hawes v. State*, 88 Ala. 37, 7 So. 302 (1890), Hawes was on trial for the murder of his wife and two children:

J. T. Glover was introduced as a witness for the state, and testified that he was confidential clerk, in the office of Hewitt, Walker & Porter; that he knew defendant; and first saw him early in September; that Hawes came into the office, and asked him if he was a lawyer, and he answered that he was not; and that Hawes said that the object of his visit was to get a divorce. Defendant objected to any evidence by said Glover, showing any conversation between him and witness concerning a divorce proceeding, because witness was a confidential clerk of the law firm whom defendant went to consult; but the court overruled this objection, and defendant excepted. The witness continued: "Hawes said he wanted a divorce as soon as he could get it."

Glover's testimony was admitted because the statements were made without any knowledge of Glover's confidential relationship to the attorneys "and without evincing any desire or purpose to have ..." [Glover] "communicate to them [the lawyers] what he was about to say, ..." *Id.* 7 So. at 313.

**4.** Assuming a broader policy approach were within our purview, it would not be wise to extend the doctrine. In *Hawes v. State, supra,* the Court noted:

... It is equally well established law that an interpreter, intermediary, agent, or clerk of an attorney, through whom communications between attorney and client are made, stands upon the same footing as his principal, and will not be allowed to divulge any fact coming to his knowledge as the conduit of information between them. But the rule extends no further than this. The reasons upon which it rests, the salutary objects, sought to be obtained by its observance, do not require that it should embrace communications made to an attorney otherwise than in securing or directing his professional services, or communications made to the agent or clerk of an attorney otherwise than for transmission to the attorney, or, at least, in and about and in furtherance of the discharge of the duties incident to the confidential relation. The privilege, in other words, is confined to communications between the attorney and his client; and extends to the necessary organs by which such communications are made, but no further.

In this regard, the military has additional, practical, problems. Legal services must be provided to service men and women under a multitude of circumstances, many of which have no counterpart in the civilian community. For example, lawyer and paralegal personnel are constantly shifting duties and responsibilities to meet the needs of their military services. To create a situation where confidentiality problems arise from communications with clerical personnel under the circumstances that were present in this case could be devastating to the mission of a particular legal office. Military lawyers would become ineligible to perform various military justice functions without an opportunity on the part of command to decide who should perform what functions. An inexperienced paralegal could become involved in legal matters of significant consequence before his or her supervisor even knew there was a problem. This is more likely in a transient military environment where personnel are constantly shifting, precluding an assessment of individual capabilities. In summary, such a situation is unacceptable in a military environment with a military mission to perform under various, unpredictable, situations.

Of course, prevention of the disclosure of communications that can effectively deter the military community's use of local legal offices can be accomplished by an appropriate statement of office policy—without encumbering such conversations with the legal burdens and ramifications of classification as "privileged communications."

Appellant requests us to take a broader policy approach to the issue and declare that communications to legalmen, as paraprofessionals, are within the scope of the attorney-client privilege. We decline to do so, as the President of the United States has limited the applicability of the privilege in such cases to communications *"when made while the relationship of client and attorney existed and in connection with that relationship ..."* (Emphasis supplied.) Paragraph 151*b*(2), *Manual for Courts-Martial, 1969 (Rev.).* [4]

We conclude that there was no privileged communication.

## B

### Attorney-Client Relationship

■ Assuming, *arguendo*, that there was a confidential communication between the appellant and legalman Chief R. to protect, we conclude that *no* attorney-client relationship between Lieutenant S., the trial counsel, and the appellant was created.

Lieutenant S. *never* provided legal assistance to appellant. Legalman Chief R. was *not* assisting Lieutenant S. or otherwise representing his interests within the context of a confidential relationship in his dealings with the accused. It is clear that Legalman Chief R. was providing limited technical guidance within his rating as a legalman. His immediate supervisor was Commander F., *not* Lieutenant S. While it was possible for Lieutenant S. to become involved in a confidential communication with the appellant *if* he had been assigned as legal assistance officer on the day in question and *if* the appellant had been referred to him for legal advice, such did not occur in the case at bar. Consequently, there was no attorney-client relationship between appellant and Lieutenant S.

## C

### Waiver

■ The accused and his wife, on *direct* examination, both testified that they had considered a divorce because of "career" differences. (R. 126–127, 150.) While the trial counsel did address the issue in his cross-examination, the door had clearly been left open for him to do so. If the defense counsel had intended to preclude the issue, he could have done so by an appropriate motion.

Further, at no time during the trial did the defense claim trial counsel was ineligible to participate in the trial nor did he raise the issue of infringement upon privileged communications or attorney-client relationships, although he clearly recognized he *might* have had an issue. (R. 177.) The record of trial demonstrates that part of the defense theory of the case rested upon alibi, fortified by a very candid search for the truth. Such a logical, practical, trial theory precludes a claim of prejudice at the appellate level. *United States v. Williamson*, 4 U.C.M.A. 320, 15 C.M.R. 320 (1954).

The exceptions to the application of the waiver doctrine, enunciated in *United States v. Stringer*, 4 U.S.C.M.A. 494, 498, 16 C.M.R. 68, 72 (1954), and *United States v. Groce*, 3 M.J. 369, 371 (C.M.A.1977), are clearly inapplicable to this case.

Consequently, we conclude that even if there had been a privileged communication and an attorney-client relationship, the defense waived the issue.

## D

### Defense Counsel's Competence

The individual military defense counsel was competent in his representation of his client. His theory of the case, alibi, was the only logical defense available to him within the context of this case. Because the accused's wife was his *only* alibi witness (except for himself), an acknowledgement of marital difficulties over "career" conflicts could serve to bolster her credibility while providing an alibi for him at his *rape* trial. Obviously, the defense counsel perceived a tactical advantage in his approach to defending his client. *See United States v. Morales*, 1 M.J. 87 (C.M.A.1975).

We have examined the record of trial, the other assignments of error, and the Government's reply thereto and have concluded that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the accused was committed. Accordingly, the findings of guilty and sentence, as approved on review below, are affirmed.

Judge BOHLEN concurs.

GLADIS, Senior Judge (concurring in the result):

I join the majority in finding that an attorney-client relationship was not established between the accused and the trial counsel, thereby disqualifying the latter, but do not accept its conclusion that the

accused's communications to Legalman Chief R. were not privileged. Nevertheless, finding a waiver of the privilege and adequate representation by defense counsel, I concur in the result and join in affirming the findings and sentence.

The accused had consulted Legalman Chief R. a paralegal in the Naval Legal Service Branch Office rendering legal assistance for advice about obtaining a divorce.[1] The majority find that the accused's communications to Chief R. were not protected by the attorney-client privilege.

Paragraph 151b, Manual for Courts-Martial, 1969 (Rev.), provides that communications between a client and an attorney or his agent, such as the attorney's clerk, stenographer, or other associate are privileged when made while the relationship of client and attorney existed and in connection with that relationship, subject to exceptions that are not pertinent here. Where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communication relating to that purpose, made in confidence by the client is at his instance permanently protected from disclosure by himself or by the legal adviser, unless the privilege be waived. United States v. McCluskey, 6 U.S.C.M.A. 545, 551, 20 C.M.R. 261, 267 (1955), citing Wigmore, Evidence § 2292 (3d ed. 1940). Although the investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion, of the privilege, the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others. The assistance of these agents being indispensable to an attorney's work and the communications of the client being often necessarily committed to these agents by the attorney or by the client himself, the privilege must include all persons who act as the attorney's agents. United States v. Kovel, 296 F.2d 918 (2d Cir. 1961).

In this case the responsibility for obtaining information from persons seeking from professional legal advisers in confidence legal advice concerning divorce had been delegated to paralegals who were authorized to determine whether the seekers met the legal prerequisites for proceeding under the California summary divorce laws and to prepare or assist in the preparation of pleadings under these laws. Under these circumstances the paralegals were the agents of the legal assistance officers. Thus the communications to the agents of the attorneys by those seeking legal advice in confidence were privileged under the principles stated above, even though they did not see the attorneys.[2] This case is distinguishable from Hawes v. State, 83 Ala. 37, 7 So. 302 (1890), cited by the majority, in which the court held that the communication could not have been confidentially imparted because the accused did not know the person he talked to was an agent of the attorney, although he knew he was not a lawyer. When attorneys delegate to paralegals the responsibility for obtaining information from persons who seek legal advice in confidence and rendering legal advice to them, these communications are privileged. The policy underlying the attorney-client privilege is that the law is complex. When an individual needs professional legal advice in order to deal with it, it is necessary that he should be able to place unrestricted and unbounded confidence in the professional agent and that the communications he makes to him should be kept secret. See United States v. Kovel, supra. Today the majority unnecessarily frustrate the policy underlying the privilege and relegate those seeking professional legal advice under the Navy legal assistance program to the status of second class citizens. Nevertheless, I join them in affirming because the record shows that the privilege was waived.

1. The record does not establish that Chief R. gave the accused no legal advice.

2. In an analogous situation communications made while negotiating to employ an attorney in his professional capacity are privileged, even though the attorney is not subsequently retained. 3 Torcia, Wharton's Criminal Evidence § 557 (13th ed. 1973.)