# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

### Juan A. GUZMAN
### Machinery Technician Third Class (E-4), U.S. Coast Guard

### CGCMG 0365
### Docket No. 1461

### 7 May 2020

Sentenced on 25 August 2017.

| | |
|---|---|
| Military Judge: | CAPT Benes Z. Aldana, USCG |
| | CAPT Matthew J. Fay, USCG |
| Appellate Defense Counsel: | LCDR Benjamin M. Robinson, USCG |
| | LT Leah K. Brett, USCG |
| Appellate Government Counsel: | CAPT Vasilios Tasikas. USCG |
| | LCDR Emily A. Rose, USCG |
| | LT Nicholas J. Hathaway, USCG |

## BEFORE
## McCLELLAND, BRUBAKER & MOORADIAN
### Appellate Military Judges

BRUBAKER, Judge:

A general court-martial composed of members with enlisted representation convicted Appellant, contrary to his pleas, of one specification of making false official statements and two specifications of sexual assault (one of which the military judge conditionally dismissed), in violation of Articles 107 and 120, Uniform Code of Military Justice (UCMJ). Appellant was sentenced to confinement for four years, forfeiture of all pay and allowances, reduction to E-1, and a dishonorable discharge, which the Convening Authority approved.

This is our second time reviewing this case. During our first review, Appellant raised the following issues: (1) whether the military judge abused his discretion by excluding evidence under Military Rule of Evidence (M.R.E.) 412, Manual for Courts-Martial (MCM), United States

(2016 ed.); (2) whether the military judge erred by failing to instruct the members that they could not convict Appellant of both of two specifications charged in the alternative; (3) whether Appellant's convictions for sexual assault by bodily harm and sexual assault of a person incapable of consenting constitute an unreasonable multiplication of charges; (4) whether the addendum to the Staff Judge Advocate's (SJA's) recommendation was deficient; (5) whether the evidence supporting the conviction for sexual assault by bodily harm is factually insufficient; and (6) whether the evidence supporting the conviction for sexual assault of a person incapable of consenting is factually insufficient (raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982)). We granted relief on the fourth issue pertaining to the SJA's recommendation and, without reaching the remaining issues, remanded for new post-trial processing. *United States v. Guzman*, No. 1461, 2019 WL 2865998, at *2 (C.G. Ct. Crim. App. July 2, 2019).

On 16 January 2020, this Court received the record with a new action dated 13 December 2019. Appellant now raises the following additional issues: (1) whether Appellant was denied his due process right to a speedy post-trial review and appeal; and (2) whether the SJA should have been disqualified from participating in the new post-trial action. We have considered, but reject, Appellant's assignments of error pertaining to unreasonable multiplication of charges and factual sufficiency. We address the remaining issues below and conclude that post-trial delay warrants sentence relief, but we otherwise affirm.

**Factual Background**

Closing time was approaching at the bar in Port Angeles, Washington, where Appellant and his friend Mario had spent the evening. They left in Appellant's car, following some women who had, according to Mario, invited them to "hang out." (R.14AUG at 788.) But, unable to keep up with them, they had decided to head home when they spotted a lone figure standing in a Safeway parking lot. Mario explained:

> [W]e were following these girls that were driving--I'd just say fast, and we lost them, and we still kind of wanted to kind of hang out, and so we saw the girl, and we were like, hey, you know, there's somebody over here hanging out, and we said, 'hello.' And she waved, and we pulled over.

(R.14AUG at 789.)

"[T]he girl," it turns out, was A.S., a 17-year-old high school student. Earlier, she had purloined two bottles of liquor and met a schoolmate and former boyfriend named M.L. They smoked, talked, and drank first in an empty playground, then in an area behind a grocery store. A.S. consumed between one-half and three-quarters of a bottle of whiskey at which point, according to M.L., she smelled like strong whiskey, was "pretty drunk," and began falling down. (R.14AUG at 711.) As M.L. prepared to go home, A.S. fell, taking M.L. down with her. M.L. propped her against a wall and tried waking her. He shook her, patted her face with his hands, and said, "This isn't really a safe place to fall asleep. This is where tweakers come, you know. You need to wake up." (R.14AUG at 713.) She did not respond. M.L. put the bottles of alcohol into A.S.'s backpack and took the backpack home with him.

A.S. testified that she awoke and M.L. was gone and it had gotten dark outside. She noticed people had been trying to reach her on her cell phone before passing out again. The next time she woke up, her shirt was missing as were her cell phone and backpack. She wanted to call her father and get back to the Lower Elwha Reservation where she lived. The grocery store she was behind was closed, so she walked toward what she knew to be a 24-hour Safeway.

Spotting her standing alone in the Safeway parking lot, Appellant and Mario offered her a ride. She got in. Appellant drove to his apartment where, according to Mario, they went straight to Appellant's bedroom, got on his bed, and Appellant began having intercourse with A.S. He invited Mario to do the same, but Mario, believing something was not right with A.S., did not participate and instead walked home.

A.S. remembered only bits and pieces from the evening: wanting to get to Safeway to call her father and get home; someone stopping as she walked to Safeway and giving her a sweater; two strangers (Appellant and Mario) asking if she needed a ride; climbing into the backseat; being confused when she arrived not at her home, but at an apartment; waking up naked on a bed unsure how she got there before passing out again; waking up with the driver of the car on top of her, his penis inside her vagina, as the other man said he was going to take off; waking up in the morning once again behind the grocery store, unaware of how she got there. As A.S. started

walking in the direction of the Reservation, a man asked if she was okay. She replied, "I think I got raped." (R.₁₄ₐᵤG at 586.)

The man called the police, who transported A.S. to a nearby hospital. During a sexual assault forensic examination (SAFE), a nurse examiner observed a one-centimeter area of redness of A.S.'s vagina and collected A.S.'s underpants and swabs from her mouth, vagina, and anus. Semen was detected on the underpants, which later was matched to two male profiles: Appellant's and M.L.'s. The vaginal and rectal swabs revealed Appellant's DNA; M.L. was specifically excluded as a contributor to the DNA on the swabs.

The members convicted Appellant of specifications alleging vaginal penetration, but acquitted him of those alleging anal penetration.

## M.R.E. 412 Evidence

Appellant twice moved to admit evidence under M.R.E. 412. First, his original trial defense counsel moved to admit evidence of a prior, sexual relationship between M.L. and A.S., including the evidence of M.L.'s semen on A.S.'s underpants. This was denied. Following a change of defense counsel as well as military judge, Appellant moved for reconsideration, refining his theory of admissibility. This was considered, but also denied. Appellant challenges both rulings, which we review for an abuse of discretion. *United States v. Ellerbrock*, 70 M.J. 314, 317 (C.A.A.F. 2011).

M.R.E. 412 is a rule of exclusion that generally bars evidence offered to prove that an alleged victim of a sexual offense engaged in other sexual behavior or has a sexual predisposition. M.R.E. 412(a); *Ellerbrock*, 70 M.J. at 317–18. "The rule is intended to shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to sexual offense prosecutions." *Id.* at 318 (internal alterations, quotation marks, and citations omitted). The rule provides for three exceptions, two of which are relevant here: (1) "evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury, or other physical

evidence"; and (2) "evidence the exclusion of which would violate the constitutional rights of the accused." M.R.E. 412(b)(1)(A), (C).

An accused seeking admission of evidence under M.R.E. 412 has the burden of establishing that he is entitled to one of its exceptions. *United States v. Smith*, 68 M.J. 445, 448 (C.A.A.F. 2010). To determine if a claimed exception applies, a military judge must determine whether the offered evidence is "relevant, material, and the probative value of the evidence outweighs the dangers of unfair prejudice." *Ellerbrock,* 70 M.J. at 318. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." M.R.E. 401(a); *Ellerbrock,* 70 M.J. at 318. Evidence is material if "the fact is of consequence in determining" Appellant's guilt. M.R.E. 401(b); *United States v. Dorsey,* 16 M.J. 1, 6 (C.M.A. 1983). Materiality is based on a "multi-factored" test: (1) the importance of the issue for which the evidence was offered in relation to the other issues in the case; (2) the extent to which this issue is in dispute; and (3) the nature of the other evidence in the case pertaining to the issue. *Ellerbrock*, 70 M.J. at 318.

To establish that the admission of evidence is constitutionally required, an accused must show that the evidence is "necessary" because it is relevant, material, and favorable to his defense. *Smith*, 68 M.J. at 448. In this context, "favorable" is synonymous with "vital." *Id.*

Even relevant and material evidence offered as an exception to M.R.E. 412 will be excluded unless an accused can demonstrate that its probative value outweighs the dangers of unfair prejudice. M.R.E. 412(c)(3); *Ellerbrock*, 70 M.J. at 319. "Those dangers include concerns about 'harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Ellerbrock*, 70 M.J. at 319 (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)).

We apply these standards to each of the two motions as presented to the military judges at the time.

*Original Motion*

Appellant's original motion invoked both the constitutionally-required exception of M.R.E. 412(b)(1)(C) and the alternative-source exception of M.R.E. 412(b)(1)(A).  Under the constitutionally-required exception, he asserted evidence showed A.S. and M.L. had dated and "had sex about a month prior to the incident," and that this was "relevant to a defense theory that [A.S.] lied about the true nature of her interactions with [Appellant] to avoid repercussions from [M.L.] and to curry favor and sympathy from him."  (Appellate Ex. XXV at 5.)  Regarding the evidence of M.L.'s semen on A.S.'s underpants, Appellant said it was "immaterial" when the sexual activity occurred because the "DNA match is *prima facie* evidence of sexual activity between them and as such, it tends to establish [A.S.'s] emotional attachment to [M.L.]."  (*Id.* at 15.)

This was a tenuous basis of admissibility under M.R.E. 412 and the military judge did not abuse his discretion in rejecting it.  The essence of Appellant's argument was that A.S.'s sexual relationship with M.L. made it more likely that she would characterize a consensual encounter with Appellant as non-consensual.  But the alleged sexual relationship, by the Defense's own proffer under this theory, had ceased about a month prior and was a relatively short-lived high school romance.  This is a far cry from the circumstances in *Ellerbrock*, where a split Court found a "direct and substantial link" between the complaining witness's alleged affair and a motive to fabricate in order to save her marriage and avoid another violent response from her husband.  *Ellerbrock*, 70 M.J. at 319.  Here, in contrast, the link is weak and speculative.

It is also important to note that the military judge allowed Appellant to introduce evidence of the *romantic* nature of the relationship between A.S. and M.L. and to explore whether A.S. had continued feelings toward M.L., whether she was angry and resentful for him abandoning her behind the grocery store, and whether this impacted her credibility.  Thus, contrary to Appellant's assertion, this case is unlike *United States v. Collier*, 67 M.J. 347 (C.A.A.F. 2009), where "the military judge's ruling prohibited *all* cross-examination and extrinsic evidence regarding a sexual *or romantic relationship* between Appellant and [the Government's main witness]."  *Id*. at 352 (emphasis added).

Under these circumstances, even if we assume relevance and materiality, Appellant fails to show that its probative value outweighed the dangers of unfair prejudice. The Defense was able to present evidence that A.S. had been in a dating, romantic relationship with M.L. and to offer its theory that M.L. spurned A.S.'s wish to rekindle the relationship and instead abandoned her, leaving her more likely to mischaracterize a consensual encounter with Appellant as non-consensual. That was the constitutionally-required theory presented to the military judge; whether this prior high school romance included sexual intercourse would have added virtually nothing to it. The danger of unfair prejudice, on the other hand, was high. It would have required unnecessarily delving into sexual relations between two troubled juveniles and caused an embarrassing, distracting line of inquiry regarding the last time the two of them had sex and when she last washed that pair of underpants. Appellant fails to demonstrate that evidence of M.L.'s and A.S.'s past sexual relationship was vital to his defense under the theory he propounded. We thus conclude that the military judge did not abuse his discretion in ruling that it was not constitutionally required.

Appellant's original motion also sought to admit the evidence of M.L.'s semen under the alternative-source exception of M.R.E. 412(b)(1)(A)—specifically that it was necessary to provide an alternative explanation for why A.S. had a small area of redness on her vagina. The military judge rejected this theory, but we need not determine whether this was error. The Government never offered evidence of vaginal injury, obviating the need to offer an alternative source for it. This mooted the ruling and rendered any error harmless.

In fact, the Defense opted to elicit the evidence and use it for its own purposes. Trial defense counsel expressly elicited that the SAFE nurse examiner observed a one-centimeter area of redness, that this did not indicate whether the source of the redness was consensual or non-consensual, and that, in contrast, there was no indication of redness or injury to the anus. Then, in its case-in-chief, the Defense presented unrebutted expert testimony that such a small area of vaginal redness can be caused not only by either consensual or non-consensual intercourse, but by non-sexual causes such as skinny jeans. The absence of physical injury to the anus, on the other hand, indicated that nonconsensual anal intercourse was "not very likely at all." (R.14AUG at 1010.) The Government made no mention of vaginal injury in its argument, but the Defense did.

After conceding Appellant had vaginal intercourse with A.S., it attacked the evidence of anal penetration, stating that the only injury found during the SAFE was the one-centimeter area of redness on the vagina, which is common even during consensual intercourse. (R.14AUG at 1264–66.) The members acquitted Appellant of the specifications alleging anal penetration. Under these circumstances, we are convinced that any error was harmless.

*Motion for Reconsideration*

Appellant's motion for reconsideration before a new military judge invoked only the alternative-source exception of M.R.E. 412(b)(1)(A). But he now posited that evidence of M.L.'s DNA on A.S.'s underpants was admissible not only as an alternative source of the vaginal injury, but of the semen found on A.S.'s underpants. In his ruling, the military judge dismissed "in short order" the theory that evidence of semen identified as M.L.'s provided an alternative source for semen identified as Appellant's, stating:

> the fact that both [M.L.'s] and [Appellant's] semen was found on the underpants of A.S. does not support the proposition a 'person other than the accused was the source of semen' per M.R.E. 412(b)(1)(A). It is clear there were two sources of semen and the fact [M.L.'s] semen was discovered does not disprove [Appellant's] was also discovered.

(Appellate Ex. LI at 4.)

The remainder of the ruling addressed whether the evidence was admissible as an alternative source of the vaginal injury, which, for reasons already stated, was harmless even if erroneous. Regarding whether it was admissible as an alternative source of semen, we agree with the military judge. Appellant failed to demonstrate that the evidence was relevant and material to the exception he claimed applied.

Appellant now attempts, in effect, to supplement the motion by arguing that the evidence was necessary to confront M.L.'s credibility and to support a Defense theory that M.L., not Appellant, sexually assaulted A.S. This, however, sounds in the constitutionally-required exception and is not the theory propounded in the motion for reconsideration. Considering the motion actually presented, not the one appellate counsel now *wishes* was presented, *see United*

*States v. Carpenter*, 77 M.J. 285, 289 (C.A.A.F. 2018), we cannot fault the military judge for concluding that the alternative-source theory did not apply.

We thus conclude that neither military judge prejudicially erred.

**Instructions**

The members convicted Appellant of two specifications of sexual assault: Specification 1 for committing a sexual act upon a person incapable of consenting due to impairment by an intoxicant, and Specification 2 for committing a sexual act without consent. After the verdict, the military judge, responding to Appellant's motion, conditionally dismissed Specification 2 as an unreasonable multiplication of charges with Specification 1. Both specifications were, as the Government concedes, for the same sexual act and had been pleaded and tried in the alternative to accommodate exigencies of proof.

Appellant now asserts that the post-verdict dismissal was not enough: that the military judge prejudicially erred by not instructing the members that they could convict on one or the other of the specifications, but not both. We review whether the members were properly instructed *de novo*, but because Appellant did not raise this objection below, he must show plain error by demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of his. *United States v. Payne*, 73 M.J. 19, 22–23 (C.A.A.F. 2014).

Appellant does not contest the long-recognized practice of charging and trying offenses in the alternative for exigencies of proof. *See United States v. Elespuru*, 73 M.J. 326, 329 (C.A.A.F. 2014). But, he posits, before deliberating on offenses charged in the alternative, members must be instructed that they can only convict on one of them and that an accused is entitled to an acquittal on the remainder. Appellant cites no military authority for this proposition, but avers that it is dictated by *United States v. Gaddis*, 424 U.S. 544 (1976), and supported by *United States v. Marshall*, 248 F.3d 525, 536 (6th Cir. 2001).

These cases, however, do not make such a broad claim. *Gaddis*, *Marshall*—and, we would add, *Heflin v. United States*, 358 U.S. 415 (1959), and *Milanovich v. United States*, 365 U.S. 551 (1961), and their progeny—address offenses that the Court, applying statutory interpretation, concluded are inconsistent with one another, meaning that a defendant statutorily can be guilty of one or the other, but not both simultaneously. *See, e.g., Milanovich*, 365 U.S. at 553–54; *Heflin*, 358 U.S. at 420. Specifically, these cases conclude that it is inconsistent for a defendant simultaneously to be guilty of offenses related to stealing property and receiving or possessing the same property. *Id*. This rule has been extended to military offenses. *United States v. Cartwright*, 13 M.J. 174, 176 (C.M.A. 1982) (setting aside guilty plea to receiving stolen property because, though charging both larceny and receipt of stolen property "may be warranted by exigencies of proof, the general rule is that the trier of fact may not find the accused guilty of both charges.") (citing *Gaddis*, 424 U.S. at 550).

Indeed, the Supreme Court has held that because convictions for stealing and receiving the same goods are statutorily inconsistent, trial judges must instruct juries that they may convict on one or the other offense, but not both. *Milanovich*, 365 U.S. at 554–55. If an appellate court concludes that a trial judge failed to do so and both offenses are supported by the evidence such that the court has "no way of knowing whether a properly instructed jury would have found the [defendant] guilty of larceny or of receiving (or, conceivably, of neither)," it must set aside *both* convictions and remand for a new trial. *Id.* at 555–56.

This is the relief that Appellant seeks. But the line from *Gaddis* and related cases to Appellant's case is far from plain or obvious. Appellant seems to contend that the *Gaddis* rule applies to *all* offenses pleaded in the alternative, but we find no support for this. To the contrary, military courts have long been tolerant—even approving—of the practice of addressing offenses tried in the alternative post-verdict. *See, e.g., Elespuru*, 73 M.J. at 329–30 ("We have held before that when a panel returns guilty findings for both specifications and it was agreed that these specifications were charged for exigencies of proof, it is incumbent either to consolidate or dismiss a specification. . . . Dismissal of specifications charged for exigencies of proof is particularly appropriate given the nuances and complexity of Article 120, UCMJ, which make charging in the alternative an unexceptional and often prudent decision.") (internal quotation

marks, citations, and alterations omitted); *United States v. Morton*, 69 M.J. 12, 16 (C.A.A.F. 2010) ("In cases where offenses are pleaded for exigencies of proof, depending on what the plea inquiry reveals or of which offense the accused is ultimately found guilty, the military judge may properly accept the plea and dismiss the remaining offense."); *United States v. Drexler*, 26 C.M.R. 185, 187–88 (C.M.A. 1958) ("To meet the exigencies of proof, the Government may properly allege one offense in different ways. However, when it is manifest that one charge is identical to another, a motion to dismiss one or the other is proper.") (citations omitted).

By addressing the offenses tried in the alternative post-verdict and dismissing the specification that Appellant requested, the military judge acted in accord with a long line of military caselaw. *Gaddis* notwithstanding, he did not plainly err by doing so.

## Speedy Post-Trial Review and Appeal

Appellant asserts he was deprived of his due process right to a speedy post-trial review and appeal.

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006). We review whether Appellant was denied this right *de novo*, applying a three-tiered analysis. *Id.*

First, we must determine whether the post-trial delay is facially unreasonable. *Id.* at 136. The Court in *Moreno* established standards for when post-trial delay is presumed to be unreasonable: (1) when the convening authority does not take action within 120 days of the completion of trial; (2) when the record of trial is not docketed with the Court of Criminal Appeals (CCA) within thirty days of the convening authority's action; or (3) when the CCA does not render a decision within eighteen months of docketing the case. *Id.* at 142.

Second, facially or presumptively unreasonable delay triggers a full analysis of whether a due process violation occurred by weighing the four *Barker* factors: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. *Id.* at 135 (citing *Barker v. Wingo,* 407 U.S. 514, 530 (1972)). "No

single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136.

Third, and finally, if we conclude there was a due process violation, we must grant relief unless we are convinced beyond a reasonable doubt that the error is harmless. *United States v. Toohey*, 63 M.J. 353, 363 (C.A.A.F. 2006). However, even for delay not rising to the level of a due process violation, we can, under appropriate circumstances, grant relief under Article 66(c), UCMJ. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

Here, there was presumptively unreasonable post-trial delay. Appellant's trial concluded on 25 August 2017. The Convening Authority took his first action on 1 February 2018—160 days later. On 26 February 2018, the case was docketed with this Court; on 2 July 2019, we rendered our decision setting aside the Convening Authority's action and remanding for new post-trial processing. The Convening Authority took his second action on 13 December 2019—164 days after our decision. The case was then forwarded and re-docketed with this Court on 16 January 2020—thirty-four days after the Convening Authority's new action.

We conclude that there were three periods of presumptively unreasonable delay: (1) from the conclusion of trial to the original Convening Authority's action; (2) from our decision to the new Convening Authority's action; and (3) from the new Convening Authority's action to docketing with this Court. Regarding the periods following remand, we agree with our sister Court: "Although *Moreno* specifically dealt with initial post-trial processing, the same timeliness standards logically apply to cases returned by this court for new post-trial processing." *United States v. Turpiano*, No. ACM 38873, 2019 WL 4274053, at *4 (A.F. Ct. Crim. App. Sept. 10, 2019), *review denied*, No. 20-0065/AF, 2020 WL 1183391 (C.A.A.F. Feb. 11, 2020)). We thus conclude that there was a total of eighty-eight days of presumptively unreasonable delay. This triggers a full analysis of whether there was a due process violation by considering each of the *Barker* factors.

1. *Length of the Delay*

The entire period of time from the conclusion of trial to this decision is 986 days. Considering this is our second opinion after granting relief and remanding in the first, this, by itself, is not unreasonable. *Cf., e.g., Moreno*, 63 M.J. at 136 (concluding that 1,688 days from conclusion of trial to the CCA's first and only decision was unreasonable). We also note that the 676-day period that elapsed from the conclusion of trial to our first opinion was within the total trial-to-decision timeframe envisioned by *Moreno* and is not, by itself, unreasonable. Nor is the 310-day period from our original decision to this one. We thus focus on the eighty-eight days of facially unreasonable delay discussed above.

2. *Reasons for the Delay*

"Under this factor we look at the Government's responsibility for any delay, as well as any legitimate reasons for the delay, including those attributable to an appellant. In assessing the reasons for any particular delay, we examine each stage of the post-trial period . . . ." *Id.*

Regarding the delay from the completion of trial to the first Convening Authority's action, the SJA noted that it took seventy-four days from the completion of trial for contractors to get a transcribed record of trial to the trial counsel; fourteen days for the trial counsel to examine the record; an additional six days to send a copy to the defense counsel for pre-authentication examination; and the military judge did not authenticate the record until 116 days after the conclusion of trial. The Government also points out that it was a lengthy record and that following the SJA's recommendation, Appellant sought and received a twenty-day extension to submit matters. But barring the twenty-day extension, all of this only explains the delay without providing any legitimate reasons for it. For instance, the Government remains responsible for timely transcription, even if contracted out. The finished transcript was 1,972 double-spaced pages, which is sizeable, but not unusually so for a contested sexual assault case.

But more troubling to us is the period following our remand. The record of trial was already transcribed, authenticated, and ready for a fresh SJA's recommendation. Yet—bearing in mind that we sent the case back due to errors in post-trial processing—it took eighty-five days to accomplish this, then an additional fourteen days to serve the recommendation on Appellant's

counsel. Ten days later, Appellant timely submitted matters, pointing out new errors in the recommendation. It then took fifty-one days to sign an addendum correcting the errors and have it served on counsel. After Appellant submitted a demand for speedy review, the SJA signed a second addendum and the Convening Authority acted the next day. But then, as previously noted, it took thirty-four days from the date of the new action before the case was docketed with the Court.

The Government offers no explanation for these post-remand delays and we can discern no legitimate reasons for them. This factor weighs in Appellant's favor.

3. *Assertion of Right to Speedy Post-Trial Review and Appeal*

Appellant submitted a written demand for speedy post-trial review on 10 December 2019. As the Government points out, this was late in the process, but Appellant's counsel had previously raised the issue, so we view this factor as weighing in Appellant's favor.

4. *Prejudice*

Before analyzing this factor, we first address what evidence we may consider. After the record of trial was referred to us, appellate defense counsel moved to attach two declarations by Appellant, which included several enclosed documents, as evidence that he had been prejudiced by post-trial delay. The United States Court of Appeals for the Armed Forces recently cabined our authority to consider such appellate-level submissions in *United States v. Jessie*, No. 19-0192, 2020 WL 1777149 (C.A.A.F. Apr. 6, 2020). Interpreting the statutory requirement for CCAs to make legal and factual determinations "on the basis of the entire record," it held that, as a general rule, CCAs may not consider evidence submitted for the first time on appeal because they are "outside the 'entire record.'" *Id.* at *6 (quoting Article 66(c), UCMJ). The Court, however, noted some exceptions to this general rule, including "when doing so is necessary for resolving issues raised by materials in the record." *Id.* at *7. In these instances, "'extra-record fact determinations' may be 'necessary predicates to resolving appellate questions' that arise during Article 66(c), UCMJ, reviews." *Id.* at *5 (quoting *United States v. Parker*, 36 M.J. 269, 272 (C.M.A. 1993).

We conclude that Appellant's declarations fall within this exception. Though they are clearly "extra-record," the materials that are within the record raise the issue of post-trial delay and the affidavits are necessary to resolve whether post-trial delay caused cognizable prejudice. *Accord, e.g., United States v. Jones*, 61 M.J. 80, 85 (C.A.A.F. 2005). We thus have granted the motions to attach and will consider them in our analysis.

Moving into the analysis, there are three types of cognizable prejudice in a post-trial delay context, each of which we will consider in turn: (1) oppressive incarceration pending appeal; (2) anxiety and concern of those convicted awaiting the outcome of their appeal; and (3) impairment of the ability to present a defense at a rehearing. *Moreno*, 63 M.J. at 138–40.

a. *Oppressive Incarceration Pending Appeal*

Because we have now considered and rejected Appellant's substantive grounds for appeal, Appellant has not suffered cognizable prejudice under this sub-factor. *See id.* at 139 ("This sub-factor is directly related to the success or failure of an appellant's substantive appeal. If the substantive grounds for the appeal are not meritorious, an appellant is in no worse position due to the delay, even though it may have been excessive. Under these circumstances, an appellant would have served the same period of incarceration regardless of the delay.") (citations omitted).

b. *Anxiety and Concern*

Prejudice under this sub-factor is not dependent on the outcome of the appeal, but an appellant must "show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* at 140.

Appellant, who was released from confinement on 11 February 2020, attests to anxiety over having to register as a sex offender knowing that his appeal could change his status and concern over not qualifying for certain unemployment, financial, and housing benefits because he lacks a discharge certificate. The *Moreno* Court recognized that being required to register as a sex offender upon release from confinement without an appeal being resolved can, and did in Moreno's case, cause cognizable anxiety. But Moreno had been released for *years* living "under

the opprobrium of guilt" before his appeal was resolved as opposed to the *months* since Appellant's release. Also, the CAAF emphasized that "the excessive delay" in *Moreno* coupled with resolving a substantive issue in Moreno's favor lent "credence to Moreno's claim that he was prejudiced by the requirement to register as a sex offender." *Id.* Those factors are not present here.

Appellant comes closer to demonstrating cognizable prejudice from his inability to obtain unemployment, financial, and housing benefits. His claims are still not fully substantiated, but his affidavits provide a degree of specificity, explanation, and support found wanting, for example, in *United States v. Allende*, 66 M.J. 142, 145 (C.A.A.F. 2008) (noting that appellant, though attesting he was denied employment due to lacking a discharge certificate, had neither provided "documentation from potential employers regarding their employment practices, nor has he otherwise demonstrated a valid reason for failing to do so.").

c. *Impairment of Ability to Present a Defense at a Rehearing*

This sub-factor, too, is directly tied "to whether an appellant has been successful on a substantive issue of the appeal and whether a rehearing has been authorized. If an appellant does not have a meritorious appeal, there obviously will be no prejudice arising from a rehearing." *Id*. Thus, Appellant has not suffered cognizable prejudice under this sub-factor.

On balance, we are dubious that the delays in this case rise to the level of a constitutional due process violation. Still, we are mindful of Appellant's challenges substantiating prejudice under the circumstances, and the laggard post-trial processing—particularly following remand— evinces a lack of attention to detail and institutional diligence. *Cf. United States v. Greene*, 64 M.J. 625, 628 (C.G. Ct. Crim. App. 2007). Thus, as permitted by Article 66(c), UCMJ, and *United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002), we grant relief in our decretal paragraph.

## Whether SJA Was Disqualified

Appellant asserts that the SJA should have been disqualified from participating in the post-trial review on remand because she provided the advice during the first post-trial review that we deemed erroneous. We disagree.

We review whether an SJA should have been disqualified *de novo*. *United States v. Taylor*, 60 M.J. 190, 194 (C.A.A.F. 2004). Appellant "has the initial burden of making a *prima facie* case" for disqualification. *Id.* An SJA must be, and appear to a reasonable observer to be, objective. *Id.* at 193. A person is *per se* disqualified from acting as an SJA if she previously acted as a member, military judge, trial counsel, defense counsel, or preliminary hearing officer in the case. Article 6(c), UCMJ; Rule for Courts-Martial (R.C.M.) 1106(b), Manual for Courts-Martial, United States (2016 ed.). An SJA may also be disqualified if she "has other than an official interest in the same case" or "must review that officer's own pretrial action (such as the pretrial advice under Article 34; *see* R.C.M. 406) when the sufficiency or correctness of the earlier action has been placed in issue." R.C.M. 1106(b), Discussion. The phrase "other than an official interest" means "a personal interest or feeling in the outcome of a particular case." *United States v. Sorrell*, 47 M.J. 432, 433 (C.A.A.F. 1998).

Here, we discern no basis for the SJA's disqualification, *per se* or otherwise. When we remanded the case, we were not asking her to review the sufficiency of her own advice; we had already done that, found error, and set it aside. This can happen to any participant in the military justice system. In this sense, an SJA providing new advice consistent with a judicial decision does not differ from a military judge or particular judges on an appellate court reconsidering a ruling that a superior court has deemed erroneous. This, by itself, in no way indicates that the participant has anything other than an official interest on remand or cannot remain objective. *But see United States v. McDowell*, 59 M.J. 662, 666 (A.F. Ct. Crim. App. 2003) ("It is reasonable to infer that [an SJA] might take a personal interest in a case that was returned to his or her convening authority because of an incorrect [SJA's recommendation].").

We have full confidence, as would a reasonable observer, that the SJA provided objective—and ultimately correct—advice. It thus was not error for her to participate in post-trial processing on remand.

### Decision

Only so much of the sentence as provides for confinement for forty-five months, forfeiture of all pay and allowances, reduction to E-1, and a dishonorable discharge is approved. The findings, and the sentence as modified, are correct in law and fact and are affirmed.

Chief Judge McCLELLAND and Judge MOORADIAN concur.



For the Court,

L. I. McClelland
Chief Judge