# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Ethan W. TUCKER
### Seaman (E-3), U.S. Coast Guard

## CGCMG 0380
## Docket No. 1472

## 7 April 2022

General court-martial sentence adjudged on 17 September 2020.

| | |
|---|---|
| Military Judge: | CDR Tamara S. Wallen, USCG |
| Appellate Defense Counsel: | CDR Jeffrey G. Janaro, USCG |
| Appellate Government Counsel: | LCDR Nicholas J. Hathaway, USCG (argued) |
| | CAPT Vasilios Tasikas, USCG |
| | Mr. Mark Jamison, Esq. |

## BEFORE
## MCCLELLAND, BRUBAKER & HERMAN
### Appellate Military Judges

BRUBAKER, Judge:

Not unlike customary international law, there is a body of customary *military* law that recognizes certain conduct as criminal in our specialized, military society—not through a specific statutory prohibition, but by dint of "longstanding customs and usages of the services."[1] In enacting the first two clauses of the "general article" (now Article 134, Uniform Code of Military Justice (UCMJ)), Congress incorporated customary military law into our criminal code.[2] The President has listed many of these customary offenses in the Manual for Courts-Martial (*MCM*),[3] but these do not—and cannot—create substantive criminal law; they are mere "examples" of customary offenses.[4] There are others that, though otherwise unenumerated either

---

[1] *Parker v. Levy*, 417 U.S. 733, 746–47 (1974).

[2] *Id.* at 744–47.

[3] *See MCM* (2019 ed.), pt. IV, paras. 92–108 at IV-138–151.

[4] *United States v. Jones*, 68 M.J. 465, 471 (C.A.A.F. 2010).

by Congress or by the President, also exist under customary military law.[5]

These unenumerated Article 134 offenses have sometimes been referred to as "novel."[6] But this appellation is problematic; we will avoid it. An offense being "novel"—or "new and not resembling something formerly known or used"[7]—stands in conflict with how customary law works. Article 134 is not an invitation for those making charging decisions to get creative. To the contrary, an offense under the first two clauses of Article 134, whether previously written or not, must be grounded in already-known custom and usage. If an offense is truly novel—new, lacking any semblance to something formerly known or used—it per se does not stand among the services' longstanding customs and usages and cannot be the basis for a criminal conviction.[8] Such is the case we have here.

A military judge sitting as a general court-martial convicted Appellant of violating a lawful general order, making a false official statement, and committing an unenumerated, general disorder involving death of another in violation of Articles 92, 107, and 134, UCMJ. Also consistent with his pleas, the military judge found Appellant not guilty of involuntary manslaughter and negligent homicide under Articles 119 and 134, UCMJ. The military judge, however, found Appellant guilty of involuntary manslaughter's lesser-included offense of assault consummated by a battery under Article 128, UCMJ. The military judge sentenced Appellant to reduction to E-1, a bad-conduct discharge, and confinement for fourteen months. Judgment was entered accordingly.

Appellant raises seven assignments of error, paraphrased as follows:

(1) The unenumerated Article 134 specification fails to state an offense;

---

[5] *See, e.g., United States v. Vaughan*, 58 M.J. 29, 35 (C.A.A.F. 2003) (child neglect); *United States v. Hoffman*, No. 201400067, 2020 WL 3045674, at *6 (N.M. Ct. Crim. App. 8 June 2020) (unpub.) (attempted child enticement).
[6] *See United States v. Reese*, 76 M.J. 297, 298, n.2 (C.A.A.F. 2017).
[7] https://www.merriam-webster.com/dictionary/novel
[8] *See, e.g., United States v. Merritt*, 72 M.J. 483, 485 (C.A.A.F. 2013) (setting aside conviction for unenumerated offense of viewing child pornography).

(2) Appellant's plea of guilty to the unenumerated Article 134 specification was improvident;[9]

(3) The staff judge advocate (SJA) had other than an official interest in the outcome of the case and therefore was disqualified from participating in the case;

(4) The SJA's participation created an appearance of unlawful command influence (UCI);[10]

(5) The military judge erred by failing to address legal defenses in her special findings;

(6) The sentence is inappropriately severe; and

(7) Appellant was prejudiced by unreasonable post-trial delay.

We heard oral argument on the first two issues pertaining to the unenumerated Article 134 offense. We conclude that the military judge abused her discretion by accepting Appellant's plea of guilty to that offense. This moots the first issue, because more fundamental than whether there was error in *charging* the offense—and the unsettled question of whether, in light of recent amendments to the Rules for Courts-Martial, such error was waived, forfeited, or neither—is our conclusion that Appellant's *plea and conviction* were for non-criminal conduct and barred by presidential limitation. We thus set aside the conviction and reassess the sentence, which moots the sentence severity issue. We address the remaining issues, but find no further error.

## Background

On 26 January 2019, the Coast Guard Cutter *Douglas Munro* (WHEC 724), in the midst of a Bering Sea patrol, was moored in Dutch Harbor, Alaska. Many of the crew on liberty that evening headed to a local bar. Appellant, Seaman Kelch, and Seaman T.H., who were friends, fellow members of the cutter's Deck Division, and underage, had other plans. Armed with a bottle of whiskey provided by an of-age shipmate, they had the cutter's liberty van drop them off at a trailhead and hiked from there to an area of rocky beach where there was an old CONEX box. There, they planned to "have a good time, relax, and just hang out for the night." (R. at

---

[9] In his brief, Appellant actually framed this in terms of legal and factual insufficiency of the evidence. But because he pleaded guilty to it, there is no "evidence" for us to consider; we instead review whether his plea was provident under an abuse of discretion standard. *United States v. Hiser*, __ M.J. __, No. 21-0219, 2022 WL 152354, at *5 (C.A.A.F. Jan. 13, 2022) ("When an accused has pleaded guilty, we do not review the 'evidence' for legal sufficiency for the simple reason that there is no evidence when there is no trial.").

[10] Appellant personally raised issues (3) and (4) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

481.) They built a fire, played some music, and passed the bottle until the three of them, particularly Appellant and Seaman Kelch, became increasingly inebriated.

After Seaman Kelch expressed difficulties in his life, he and Appellant "started bickering back and forth about each other's childhood, and kind of who had it worse." (R. at 485.) Seaman Kelch became upset. Appellant and Seaman T.H. tried to comfort him, but he "started kind of freaking out, like throwing things, kicking stuff around." (R. at 485.) This included "kicking around the fire and grabbing like pieces of wood and stuff out of the fire, and like throwing it out the window." (R. at 548.) Appellant and Seaman T.H. tried to get him to stop, and Appellant wrapped his arms around Seaman Kelch "sort of like a bear hug, and then it moved up towards a head lock." (R. at 485.) Seaman Kelch got out of the hold, the two fell backwards, and Appellant hit his head on the CONEX box. Everyone decided at that point that it was time to head back to the cutter.

After gathering things up and starting to make their way back to the cutter, Appellant and Seaman T.H. stopped, realizing that Seaman Kelch was no longer with them. With a cold rain falling, they called out and looked for Seaman Kelch until they found him lying at the water's edge, water lapping up on him and yelling incoherently. After unsuccessfully trying to comfort Seaman Kelch and to convince him to get up and walk toward the cutter, they both tried grabbing Seaman Kelch to get him up and to drag him to safety, but Seaman Kelch was resistant, flailing his arms, falling back to the ground, and rolling back toward the water.

Growing frustrated, Appellant straddled Seaman Kelch, grabbed him by the scruff of his jacket, "and like went down face-to-face, forehead-to-forehead and was begging him, trying to convince him to get up and start making it back." (R. at 496.) Seaman Kelch, however, "just wasn't cooperating. He wasn't helping us in any way." (R. at 496). Out of what the parties stipulated was frustration, Appellant punched Seaman Kelch two or three times in the chest and the side of the face. Seaman T.H. intervened, telling Appellant not to hit Seaman Kelch, at which point Appellant got off of Seaman Kelch, made his way up the bank, and lay down in the grass.

4

Seaman T.H. then tried to drag Seaman Kelch out by himself multiple times, but kept slipping and falling on the rocks. Eventually, he was able to pull Seaman Kelch by his belt and got him up from the waterline as much as he could. At that point, neither Seaman Kelch nor Appellant were moving and Seaman T.H. decided it was time to take a break. After catching his breath, he made his way to Appellant, who was still lying on his back, and yelled at him that he was going back to the cutter to get help.

It took Seaman T.H. thirty to forty-five minutes to walk back to the cutter, at which point he informed a shipmate of the situation. The shipmate, telling Seaman T.H. to remain behind, gathered two others and had the duty driver take them to the trailhead. They soon located Appellant lying on his back, unconscious. They shook him awake, but he was incoherent, cold to the touch, his clothes soaking wet. One of the colleagues put some of his own dry clothes on Appellant and brought him back to the liberty van to warm up. As he started to warm up, Appellant grabbed his colleague by the collar and said, " '[Y]ou've got to go find Kelch, man, you've got to go save Kelch.' Just like kept saying this over and over." (R. at 828.)

Meanwhile, the others could not find Seaman Kelch, so they returned to the cutter and notified the chain of command, who convened an official search party. After hours of searching, the party found Seaman Kelch face down in the surf. He was declared dead early the morning of 27 January 2019.

The Government initially charged Appellant with murder and manslaughter, along with several more minor offenses. But, consistent with a plea agreement, it withdrew the murder charge and referred in its place a charge under Article 134, UCMJ, with two specifications: (1) negligent homicide by causing blunt force trauma to Seaman Kelch and leaving him alone; and (2) an unenumerated offense alleging a series of acts, each of which contributed to Seaman Kelch's death. Appellant pleaded and was found guilty of drinking underage in violation of a lawful general order, making a false official statement to investigators, and taking actions that contributed to Seaman Kelch's death. The military judge acquitted Appellant of both contested charges of involuntary manslaughter and negligent homicide, but convicted him of involuntary manslaughter's lesser-included offense of assault consummated by a battery.

**Providence of Plea to Unenumerated Offense**

Before accepting a plea of guilty, a military judge must conduct an inquiry and determine if there is an adequate basis in law and fact to support it. *United States v. Inabinette*, 66 M.J. 320, 321–22 (C.A.A.F. 2008). We review a military judge's decision to accept a guilty plea for an abuse of discretion, but we review questions of law arising from the guilty plea—such as whether an accused's conduct constitutes a crime under the UCMJ—de novo. *United States v. Weeks,* 71 M.J. 44, 46 (C.A.A.F. 2012); *Inabinette*, 66 M.J. at 322. The decision to accept a plea of guilty is an abuse of discretion if it is not supported by an adequate factual basis or if it is based on an erroneous view of the law. *Inabinette*, 66 M.J. at 322. We will overturn a military judge's decision to accept a plea only if there is a substantial basis in law or fact for questioning the guilty plea. *Id*.[11]

> Appellant pleaded guilty to a specification alleging that he:
>
> wrongfully did or failed to do certain acts, to wit: consuming alcohol to the point of severe inebriation at a remote location on Amaknak Island, while it was dark outside, raining and near freezing, without properly notifying fellow crew of the location and without ensuring any effective means of requesting necessary assistance, and then leaving [Seaman Kelch] alone after it was clear that he was disoriented and in extremis due to intoxication and the effects of the elements, each of which actions contributed to the death of [Seaman Kelch]. Under the circumstances, this conduct was to the prejudice of good order and discipline in the armed forces.[12]

During the guilty plea inquiry, the military judge explained that Appellant had pleaded guilty "to failing to do certain acts to the prejudice of good order and discipline in the armed forces, a violation of Article 134 of the [UCMJ]." (R. at 391). She then explained the elements of the offense as:

---

[11] The Government cogently notes that the Supreme Court recently applied a *plain error* standard to a guilty plea—even to the purely legal question of whether a plea colloquy properly advised the defendant of a mens rea element. *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021). Because the Court's analysis expressly hinges on application of Federal Rules of Criminal Procedure not applicable to courts-martial, we do not read it as obviating our responsibility to adhere to our superior court's longstanding precedent on standards for reviewing guilty pleas. Under the circumstances of this case, even were we to review for plain error, we would still conclude that relief was warranted.

[12] Charge Sheet.

(1) that Appellant wrongfully did or failed to do certain acts, to wit: [listing verbatim the acts alleged in the specification], each of which actions contributed to the death of Seaman Kelch; and

(2) that, under the circumstances, Appellant's conduct was to the prejudice of good order and discipline in the armed forces.

The only further explanation that the military judge offered was to define "conduct to the prejudice of good order and discipline" and "wrongfully." Appellant then admitted that he committed those acts, that they contributed to Seaman Kelch's death, and that, under the circumstances, his conduct was prejudicial to good order and discipline.

We conclude that at the time of Appellant's conduct, there was no reasonably-known custom or usage prohibiting his conduct independent of the enumerated Article 134 offense of negligent homicide. The military judge therefore abused her discretion by accepting a plea of guilty to conduct that was: (1) not a crime under the UCMJ; and (2) covered by a presidentially-enumerated Article 134 offense, and thus barred from being charged as an unenumerated Article 134 offense.

### 1. Lack of Criminality

Clause 1 of Article 134, UCMJ, provides, "Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces . . . shall be punished . . . ." Taken literally, this would appear to criminalize any act or omission that results in prejudice to good order and discipline. We must emphasize: *it does not*. Article 134 survives vagueness challenges only because it is read "not *in vacuo*, but in the context in which the years have placed it." *United States v. Frantz*, 2 U.S.C.M.A. 161, 163, 7 C.M.R. 37, 39 (1953). It "is not such a catchall as to make every irregular, mischievous, or improper act a court-martial offense," *United States v. Sadinsky*, 14 U.S.C.M.A. 563, 565, 34 C.M.R. 343, 345 (1964), but instead has "acquired the core of a settled and understandable content of meaning"— as illustrated by concrete examples of Article 134 offenses explicitly listed in the *MCM*. *Frantz*, 2 U.S.C.M.A. at 163. That "core of settled and understandable content" is acquired through *custom and usage*: "the longstanding customs and usages of the services"—also known as "customary military law"—"impart accepted meaning to the

seemingly imprecise standards of" Article 134. *Parker v. Levy*, 417 U.S. 733, 744, 746–47 (1974) (quoting *Martin v. Mott*, 12 Wheat. 19, 35, 25 U.S. 19, 35 (1827)).

> The *MCM* expounds on this:
>
> A breach of a custom of the Service may result in a violation of clause 1 of Article 134. In its legal sense, "custom" means more than a method of procedure or a mode of conduct or behavior which is merely of frequent or usual occurrence. Custom arises out of long established practices which by common usage have attained the force of law in the military or other community affected by them.

*MCM*, pt. IV, para. 91.c.(2)(b).

Given this, when the President lists offenses under Article 134, *see MCM*, pt. IV, paras. 92–108 at IV-138–151, he is "not defining offenses but merely indicating various circumstances in which the elements of Article 134, UCMJ, could be met." *United States v. Jones*, 68 M.J. 465, 471 (C.A.A.F. 2010). In other words, he is providing concrete examples of conduct that, *under customary military law*, have attained the force of law as offenses chargeable under Article 134. Other violations of customary military law that are *not* listed by the President may likewise be punished under Article 134 "*if sufficient notice of its proscription previously existed in military law*." *United States v. Kick*, 7 M.J. 82, 83 (C.M.A. 1979) (citing *Parker*, 417 U.S. at 749–54) (emphasis added).

This notice requirement is key: the "primary obstacle to prosecuting a servicemember under the general article is that the servicemember must be on 'fair notice' that his conduct was punishable under the Uniform Code." *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998) (quoting *Parker*, 417 U.S. at 756). Such notice may be found "in the *MCM,* federal law, state law, military case law, military custom and usage, and military regulations." *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003). Thus, when a purported clause 1, Article 134 offense is not specifically listed in the *MCM*, "we must look elsewhere to determine whether Appellant should have reasonably contemplated that her conduct was subject to criminal sanction, and not simply the moral condemnation that accompanies" the conduct. *Id.*

Misapplication of Article 134 in charging unenumerated offenses has been a recurring problem. *See, e.g., United States v. Gleason,* 78 M.J. 473 (C.A.A.F. 2019); *United States v. Guardado*, 77 M.J. 90 (C.A.A.F. 2017); *United States v. Reese*, 76 M.J. 297 (C.A.A.F. 2017); *United States v. Merritt*, 72 M.J. 483 (C.A.A.F. 2013); *United States v. Taylor*, 23 M.J. 314 (C.M.A. 1987); *United States v. Contreras-Ramos*, 77 M.J. 592, 596 (A. Ct. Crim. App. 2018); *United States v. Hester*, 68 M.J. 618, 621 (C.G. Ct. Crim. App. 2010). To combat this, practitioners and military judges must exercise great caution when handling these purported unwritten offenses. Two cases illustrate the searching analysis that ought to precede a conclusion that certain conduct is in fact punishable as a violation of customary military law.

In *United States v. Vaughan*, the court considered whether child neglect not resulting in harm, which had been charged as an unenumerated offense under Article 134,[13] was an offense under the UCMJ. *Vaughan*, 58 M.J. at 30. The court first emphasized the due process requirement of fair notice—both regarding the criminality of the act and "the standard applicable to the forbidden conduct"—and the sources where this notice may be found: the *MCM,* federal law, state law, military case law, military custom and usage, and military regulations. *Id*. at 31. The court then carefully surveyed these sources, noting that military case law, state laws, military custom, and several military regulations, considered together, provided requisite notice before concluding that child neglect was indeed a cognizable offense under Article 134. *Id*. at 31–33.

In *United States v. Kick*, the court considered whether negligent homicide was an offense under Article 134 as a customary-law version of homicide in addition to those enumerated by Congress: murder and manslaughter. *Kick*, 7 M.J. at 83. Emphasizing that Article 134 "must be construed in light of authoritative interpretations of military law, existing service customs and common usages," it surveyed "[p]ast court-martial practices with respect to the prosecution of negligent homicide," noting that it had long been treated as an offense under customary military law. *Id*. at 84 (citing *Parker*, 417 U.S. at 753-54; *Dynes v. Hoover*, 61 U.S. 65 (1857)). *Id*. It also agreed with a lower court's "articulation of its necessity in the military community":

---

[13] Prior to enactment of the current Article 119b, UCMJ, covering child endangerment.

> There is a special need in the military to make the killing of another as a result of simple negligence a criminal act. This is because of the extensive use, handling and operation in the course of official duties of such dangerous instruments as weapons, explosives, aircraft, vehicles, and the like. The danger to others from careless acts is so great that society demands protection.

*Id.* (citing *United States v. Ballew*, CM 434077, slip op. at *2 (A.C.M.R. 16 July 1976) (unpublished)).

Applying this framework here, we can discern no cognizable offense under customary military law that is independent of negligent homicide. *See generally, United States v. Livingstone*, 78 M.J. 619, 624–25 (C.G. Ct. Crim. App. 2018), *aff'd*, 79 M.J. 41 (C.A.A.F. 2019) ("[F]or a conviction under Article 133 to stand on its own apart from a specific offense, the Government must present a theory of liability at trial and prove how the conduct exceeded the 'limit of tolerance based on customs of the service,' *MCM*, Pt. IV, ¶ 59.c.(2), notwithstanding— that is, independent of—whether it constituted a specific offense."). Indeed, if this is not a watered-down version of negligent homicide, it is difficult to see what it *is*. The military judge explained it simply as acts, *each of which* contributed to the death of another. The Government posits we should consider that the acts, *taken together*, were prejudicial to good order and discipline, in this case by contributing to the death of another. Either way, this would seem to require extending *Kick*'s recognition of a third category of homicide (negligent homicide on top of murder and manslaughter) to a fourth category, which perhaps could be called non-negligent contributory homicide. We decline. In sharp contrast to the court's careful analysis in *Kick*, we are not aware of—nor have counsel been able to point to—a single precedent, civilian or military, recognizing such a crime, nor a single federal or state law, military custom or usage, or military regulation providing fair notice that this conduct was forbidden.

The closest the Government comes is to offer that Appellant's conduct breached a known duty to care for a fellow servicemember. This by itself, however, falls well short of a criminal standard. It is true that a panel of this Court referenced a custom to care for fellow servicemembers in *United States v. Thoms*, CGCMG 0288, slip op. at *11 (C.G. Ct. Crim. App. 15 April 2014) (unpublished). But beyond the fact that *Thoms* lacks precedential value, two fundamental problems remain. First, the military judge did not explain an offense that included a

10

specific, affirmative duty toward Seaman Kelch based on his status as a fellow servicemember and a breach by taking or failing to take certain actions that this duty required of him. Instead, the military judge only explained an offense involving acts Appellant took, each of which contributed to Seaman Kelch's death. We will not affirm on a theory that was neither explained to Appellant nor appears to have been the theory under which he was convicted. *See United States v. Medina*, 66 M.J. 21, 26 (C.A.A.F. 2008) ("A voluntary and knowing relinquishment of the constitutional rights an accused waives in pleading guilty is not possible without knowledge of the nature of the charges brought against him or her . . . ."); *Hester*, 68 M.J. at 620.

Second, *Thoms* is too thin a reed to support that a noble—but nebulous—custom of servicemembers taking care of one another, standing alone, provided Appellant fair notice that his specific actions were prohibited. This case is far different from *Thoms*, where the appellant was alleged to have sent and showed nude photographs of a shipmate to others without her consent. *Thoms*, slip op. at *9. In concluding that the appellant was on fair notice that such conduct was prohibited, the Court relied primarily on federal and state statutes criminalizing such conduct. Only then did it add that the conduct was also contrary to a custom of taking care of fellow servicemembers. *Thoms*, slip op. at *11. To clarify: while there is indeed a strong and noble tradition of servicemembers caring for one another, that, standing alone, does not provide fair notice of what, specifically, is required or prohibited of a servicemember and under what circumstances. Therefore, *Thoms* is of no avail to the Government.

Because the conduct to which Appellant pleaded guilty was not an offense under Article 134, the military judge abused her discretion in accepting his plea.

### 2. Offense was Barred

The military judge also failed to address whether the conduct to which Appellant pleaded guilty was covered by the enumerated Article 134 offense of negligent homicide, and was therefore barred from being the subject of an unenumerated Article 134 offense. We conclude it was and that she thus abused her discretion.

11

The President's explanation of Article 134 provides, "If conduct by an accused does not fall under any of the enumerated Article 134 offenses (paragraphs 92 through 109 of this Part), a specification not listed in this Manual may be used to allege the offense." *MCM*, pt. IV, para. 91.c.(6)(a). This acts to bar the Government from charging an unenumerated Article 134 offense "that is already listed inside the article's framework." *United States v. Reese*, 76 M.J. 297, 302 (C.A.A.F. 2017) (emphasis omitted).

This limitation shares its origins and purpose with the distinct, but related, doctrine of preemption. *Taylor*, 23 M.J. at 316 (citing *United States v. Manos,* 8 U.S.C.M.A. 734, 25 C.M.R. 238 (1958); *United States v. Downard,* 6 U.S.C.M.A. 538, 20 C.M.R. 254 (1955)). While the presidential limitation applies to offenses listed within Article 134, the "preemption doctrine prohibits application of Article 134 to conduct covered by Articles 80 through 132." *MCM*, pt. IV, para. 91.c.(5)(a). The military's highest court has invoked the preemption doctrine to strike down Article 134 offenses when it "perceived a danger in allowing Article 134 to be used as a basis for punishing conduct which was similar to that proscribed by specific punitive articles but which lacked some element required by those articles." *United States v. Taylor*, 23 M.J. 314, 316 (C.M.A. 1987). The court explained, "We cannot grant to the services unlimited authority to eliminate vital elements from common law crimes and offenses expressly defined by Congress and permit the remaining elements to be punished as an offense under Article 134." *Id.* (quoting *United States v. Norris,* 2 U.S.C.M.A. 236, 239, 8 C.M.R. 36, 39 (1953)).

Though early cases "dealt with preemption of conduct similar to that which was covered by a specific punitive article, the same doctrine was later applied to the creation of new, lesser-included offenses when the principal offense was itself alleged as a violation of Article 134." *Id.* (citing *Manos,* 8 U.S.C.M.A. at 734, 25 C.M.R. at 238). The *Taylor* court therefore held that a purported offense of solicitation under Article 134, minus a specific intent requirement, was preempted by the listed Article 134 solicitation offense requiring proof of specific intent. *Id.* at 318.

In short, both the preemption doctrine and the presidential limitation address the danger of the Government using Article 134 to punish conduct that is similar to an enumerated

provision, but lacks a vital element, thereby reducing its burden of proof. *See Reese*, 76 M.J. at 302, n.6. We conclude that the unenumerated offense in this case violates the presidential limitation and demonstrates its purpose.

The offense to which Appellant pleaded guilty, at its core, describes a series of poorly-conceived actions linked to the death of another. This is covered by negligent homicide, which requires the Government to prove:

(1) that a certain person is dead;

(2) that this death *resulted from* the act or failure to act of the accused;

(3) that the killing by the accused was unlawful;

(4) that the act or failure to act of the accused amounted to *simple negligence*; and

(5) that under the circumstances, the conduct of the accused was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces.

*MCM*, pt. IV, para. 103.b at IV-147.

In contrast, as described by the military judge, the unenumerated offense only required proof:

(1) that a certain person is dead;

(2) that the accused *wrongfully* did or failed to do a certain act;

(3) that the act or failure to act of the accused *contributed* to this death; and

(4) that under the circumstances, the conduct of the accused was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces.

As can be seen, the unenumerated offense is similar to the enumerated offense of negligent homicide, but it relieves the Government of two vital elements: (1) that the act or failure to act amounted to simple negligence (and instead appears to have *no* mens rea requirement); and (2) that the act or failure to act *resulted* in the death (and instead only requires that it "contributed to" the death—a far more remote, if not incomprehensibly vague, standard). Like the *Taylor* court, we are convinced that the creation of such an offense not requiring these

elements "flies in the face of" the presidential limitation, *Taylor*, 23 M.J. at 318, and is thus barred by it.

Contrary to the Government's assertion, the explanation that the acts had to be wrongful fails to convert otherwise-lawful conduct into unlawful conduct. The military judge defined "wrongful" as without legal justification or excuse. Such a concept of wrongfulness is meaningful, for instance, in the context of Article 112a, UCMJ. It generally prohibits the use of controlled substances, but because there may be lawful reasons for such use, criminality also requires wrongfulness, meaning the absence of legal justification or excuse *for otherwise-forbidden conduct*. Article 112a, UCMJ; *MCM*, pt IV, para. 50.c.(5) at IV-67. Conversely, one does not need a legal justification or excuse to do something not otherwise forbidden. It would be meaningless to ask an accused if he had any justification or excuse for failing to eat vegetables. Whatever he answers—however ill-advised and whatever moral guilt he might feel for it—failing to eat vegetables is not a crime. Likewise, Appellant's response that he had no justification or excuse for his charged acts—failing to ensure effective means of requesting necessary assistance, for instance—does nothing to demonstrate the criminality of those acts with or without justification or excuse.

Because Appellant pleaded guilty to conduct that was not a crime under the UCMJ and was barred by presidential limitation from being the basis of an unenumerated offense, there is a substantial basis to question his plea. We therefore set aside the finding of guilty to the unenumerated specification.

### Disqualification and UCI

In related assignments of error, Appellant asserts, for the first time on appeal, that the SJA was disqualified from participating in the case by having other than an official interest in it and that his continued participation created an appearance of UCI. We ultimately disagree, but before getting to the merits of the issue, we discuss the standards we applied to decide what evidence to consider in coming to this conclusion.

*Consideration of Extra-Record Evidence*

In support of his claims of UCI and disqualification, Appellant moved to supplement the record with several documents, the details of which are not important here. The Government demurred, asserting that attachment was impermissible under *United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020). In an unpublished order, we concluded that *Jessie* does not apply to appellate claims of UCI or disqualification and therefore allowed attachment of the materials we deemed relevant to those issues. Because application of *Jessie* is an emerging issue, we detail our reasoning here.

By the Government's reading, *Jessie* prohibits consideration of extra-record evidence *on any* non-jurisdictional issue unless it fits within two limited exceptions: (1) when deciding "issues that are raised by materials in the record but that are not fully resolvable by those materials"; or (2) when deciding "a limited class of issues even though those issues are not raised by anything in the record"—and this class is limited to Article 55, UCMJ, or Eighth Amendment violations. *See* Gov't's Resp. to Appellant's Mot. to Attach at 1–3 (citing *Jessie*, 79 M.J. at 440–45). But a closer inspection of precedents prior to *Jessie*, then *Jessie* itself, reveals this to be incorrect.

Appellate courts have long afforded special treatment to claims of error that would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Stringer*, 16 C.M.R. 68, 72, 4 C.M.A. 494, 498 (1954). In *Stringer*, the court held that, even if not apparent on the face of the record, "an appellate court may consider claimed error which would result in a manifest miscarriage of justice, or would otherwise 'seriously affect the fairness, integrity, or public reputation of judicial proceedings.'" *Id*. (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). Claims such as UCI, mental incapacity of the accused, and ineffective assistance of counsel all implicate the fairness, integrity, or public reputation of the proceedings themselves. Appellate courts have, accordingly, considered evidence of them without regard to whether they were previously raised in the record. *Stringer*, 16 C.M.R. at 72, 4 C.M.A. at 498.; *see also*, *e.g., United States v. Gray*, 51 M.J. 1, 15 (C.A.A.F. 1999) (noting that despite normal rule limiting appellate review to evidence presented at trial, "recourse to post-trial affidavits during direct review is appropriate . . . to clarify collateral matters such as

claims of unlawful command influence or denial of effective assistance of counsel" or "to determine whether a post-trial sanity hearing should be ordered."); *United States v. Ginn*, 47 M.J. 236, 244 (C.A.A.F. 1997) (considering extra-record evidence of ineffective assistance of counsel previously unraised in a guilty plea record).

*United States v. DuBay*, the landmark case on appellate fact-finding, offers a prime example. There, the court noted:

> In the nature of things, command control is *scarcely ever apparent on the face of the record*, and, where the facts are in dispute, appellate bodies in the past have had to resort to the unsatisfactory alternative of settling the issue on the basis of ex parte affidavits, amidst a barrage of claims and counterclaims.

37 C.M.R. 411, 413, 17 C.M.A. 147, 149 (1967) (emphasis added). The court therefore directed the now-familiar process to order an adversarial hearing to supplement the record with appellate fact-finding. *Id.*[14]

*DuBay*'s use of a hearing for appellate fact-finding may have been an innovation, but two of its citations reveal that considering evidence of UCI raised for the first time on appeal was not. In *United States v. Ferguson*, a two-judge majority held that "on a proper showing, a board of review has the power to ascertain the existence of such control, *even though no suggestion of it appears in the record of trial itself*." 17 C.M.R. 68, 82 (C.M.A. 1954) (emphasis added). In *DuBay*'s second cited case, *United States v. Shepherd*, Judge Latimer (the lone dissenter in *Ferguson*) grudgingly accepted that state of the law. 25 C.M.R. 352, 358 (C.M.A. 1958) (concurring in the result after noting that the court had "specifically held that pretrial influence by a commander could be raised for the first time on appeal.").

Cases since *Ferguson*, *Shepherd*, and *DuBay* are replete with examples of appellate consideration of evidence of UCI raised for the first time on appeal. *See, e.g., United States v. Baldwin*, 54 M.J. 308, 310 (C.A.A.F. 2001); *United States v. Bartley*, 47 M.J. 182, 186 (C.A.A.F. 1997); *United States v. Drayton*, 45 M.J. 180, 181 (C.A.A.F. 1996); *United States v. Hamilton,*

---

[14] This process is now codified in Article 66(f), UCMJ, and Rule for Courts-Martial 810(f).

41 M.J. 32, 34 (C.M.A. 1994); *United States v. Ayala*, 43 M.J. 296 (C.A.A.F. 1995); *United States v. Accordino*, 20 M.J. 102, 103 (C.M.A. 1985). Former Chief Judge Baker provided this explanation for treating issues such as UCI specially:

> The framework for addressing unlawful command influence before this Court reflects the seriousness with which the issue is considered by Congress, the President, the military, and this Court. First, the framework is intended to promote the adjudication of the facts rather than a reliance on concepts of deference and waiver. Thus, this Court reviews allegations of unlawful command influence de novo. Furthermore, "[w]e have never held that an issue of unlawful command influence arising during trial may be waived by a failure to object or call the matter to the trial judge's attention."

*United States v. Hutchins*, 72 M.J. 294, 312 (C.A.A.F. 2013) (Baker, J., dissenting) (citations omitted).


Claims that certain actors were disqualified from their role in the court-martial also implicate the fairness, integrity, or public reputation of the proceedings themselves. So, like UCI, appellate courts have considered post-trial evidence of disqualification even when not previously raised in the record. *See, e.g, United States v. Lynn*, 54 M.J. 202, 203 (C.A.A.F. 2000) (appellate military judge); *United States v. Fisher*, 45 M.J. 159, 160, 162 (C.A.A.F. 1996) (convening authority); *United States v. Edwards*, 45 M.J. 114, 114–15 (C.A.A.F. 1996) (legal officer); *United States v. Hardy*, 29 C.M.R. 337, 338 (1960) (judge advocate who prepared post-trial review); *United States v. Goodell*, 79 M.J. 614, 615 (C.G. Ct. Crim. App. 2019) (military judge).


*Jessie* did nothing to alter this landscape. In *Jessie*, the claim was that the appellant was entitled to sentence relief based on post-trial prison conditions—an issue that does not even pertain to the proceedings themselves, let alone implicate the fairness, integrity, or public reputation of them. The court's exploration of precedents on when to consider extra-record evidence of such claims was, accordingly, limited to "cases addressing the scope of the CCAs' *review of sentences* under Article 66(c), UCMJ." 79 M.J. at 440, 443 (emphasis added). *On that topic*, it found "three distinct lines of precedent." *Id.* at 440. The first established the general rule that when reviewing the sentence, CCAs must restrict appellate review to the "entire record" before it. *Id.* at 441 (quoting Article 66(c), UCMJ). The other two established exceptions to this general rule: a CCA may consider extra-record materials to review the sentence (1) when

17

deciding "issues that are raised by materials in the record but that are not fully resolvable by those materials"; and (2) when deciding "a limited class of issues even though those issues are not raised by anything in the record." *Id.* at 440.

The *Jessie* court was careful to explain it was reconciling, not overruling, its past precedents on what to consider in sentence review. *Jessie*, 79 M.J. at 444–45. It noted that the leading case for the first line of precedent, *United States v. Fagnan*, 30 C.M.R. 192, 194 (C.M.A. 1961), adhered to a strict interpretation of Article 66(c) and "limited the CCAs to considering only materials included in the 'entire record' when reviewing sentences." *Jessie*, 79 M.J. at 441. In *Fagnan*, the appellant had asked the Army Board of Review to consider, in its sentence appropriateness review, a post-trial psychiatric report and a letter concerning Fagnan's conduct during post-trial confinement. The board refused. 30 C.M.R. at 193. The Court of Military Appeals affirmed, holding "that a board of review is limited in its consideration of information relating to the appropriateness of sentence to matters included in 'the entire record.' " Thus, "the board here properly refused to consider, on the question of the appropriateness of accused's sentence, the psychiatric report and letter regarding his good conduct in post-trial confinement." *Id.* at 195.

Notably, the same three judges who decided *Fagnan* had also, three years earlier, agreed that the court may consider fresh evidence of UCI, even when the issue was not raised in the record. *Shepherd*, 25 C.M.R. at 358. Yet *Fagnan* does not even mention *Shepherd* and the precedent supporting it, let alone overturn it. The reason for this is simple: whether a CCA can consider extra-record evidence of post-conviction prison conditions to assess sentence appropriateness is distinct from whether it can consider extra-record evidence to assess a claim seriously affecting the fairness, integrity, or public reputation of the proceedings themselves, such as UCI.

As *Jessie* noted, cases after *Fagnan* allowed extra-record evidence of prison conditions in the context of previously-unraised Article 55, UCMJ, or Eighth Amendment claims. *Jessie*, 79 M.J. at 443 (citing *United States v. Pena*, 64 M.J. 259 (C.A.A.F. 2007); *United States v. Erby*, 54 M.J. 476 (C.A.A.F. 2001)). These cases were like *Fagnan* in that they involved post-trial

conditions unrelated to the proceedings themselves; the court thus considered them inconsistent with *Fagnan*. The court, rather than overruling them, deemed them exceptions to the general rule of when such evidence may be considered in sentence review. It, however, declined to extend them beyond their Article 55/Eighth Amendment context to other types of claims pertaining to prison conditions. *Jessie*, 79 M.J. at 444–45.

Just as *Fagnan* did not impeach prior precedents allowing extra-record evidence for issues such as UCI, nor did *Jessie*. Under them, we conclude it is permissible and appropriate to consider the proffered evidence that is relevant to our consideration of Appellant's claims of UCI and disqualification. With that, we turn to the merits of the claims.

*Merits of Disqualification and UCI Claims*

Appellant "has the initial burden of making a *prima facie* case" that the SJA was disqualified. *United States v. Taylor*, 60 M.J. 190, 194 (C.A.A.F. 2004). An SJA must be, and appear to a reasonable observer to be, objective. *Id.* at 193. A person is *per se* disqualified from acting as an SJA if he or she previously acted as a member, military judge, trial counsel, defense counsel, or preliminary hearing officer in the case. Article 6(c), UCMJ; Rule for Courts-Martial (R.C.M.) 1106(b). An SJA may also be disqualified if he or she "has other than an official interest in the same case" or "must review that officer's own pretrial action (such as the pretrial advice under Article 34; *see* R.C.M. 406) when the sufficiency or correctness of the earlier action has been placed in issue." R.C.M. 1106(b), Discussion. The phrase "other than an official interest" means "a personal interest or feeling in the outcome of a particular case." *United States v. Sorrell*, 47 M.J. 432, 433 (C.A.A.F. 1998).

The core prohibition of UCI derives from Article 37(a), UCMJ, which provides, in part, that no person subject to the UCMJ "may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof, in reaching the findings or sentence in any case."[15] UCI may take the form of either actual unlawful influence or the

---

[15] We apply here the version of Article 37, UCMJ, prior to its amendment in the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat. 1198 (2019). We take no position on what impact, if any, the amendment has on jurisprudence on apparent unlawful command influence.

appearance of it. *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021). Appellant asserts only the latter.

An accused asserting the appearance of UCI bears the initial burden of producing "some evidence": (1) of facts, which if true, constitute UCI; and (2) that this UCI placed an "intolerable strain" on the public's perception of the military justice system because "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *United States v. Boyce*, 76 M.J. 242, 249 (C.A.A.F. 2017) (quoting *United States v. Lewis*, 63 M.J. 405, 415 (C.A.A.F. 2006)). "A significant factor in determining whether the unlawful command influence created an intolerable strain on the public's perception of the military justice system is whether the appellant was not personally prejudiced by the unlawful command influence, or that the prejudice caused by the unlawful command influence was later cured." *Proctor*, 81 M.J. at 255 (internal quotation marks and citations omitted). If the accused carries his burden, the burden shifts to the Government to prove beyond a reasonable doubt either that the predicate facts proffered by the accused do not exist, or that the facts as presented do not constitute UCI. *Id.*

Here, Appellant premises his assertions of disqualification and UCI on: (1) an email the SJA sent to the Judge Advocate General of the Coast Guard (TJAG); and (2) the SJA's marriage to Commander (CDR) A, who was formerly the Chief of Military Justice and Command Services, Coast Guard Legal Services Command. We conclude Appellant has not carried his initial burden with respect to either assertion.

The email, sent the night of Seaman Kelch's death, provided TJAG and other top leadership a brief synopsis of the events of the day and status of the investigation and next-of-kin notifications. Although the email mentioned an investigative focus that was later debunked, the email evinces only an attempt to report, in an official capacity, what was known through investigators at that early stage. Nothing in it or any other materials reviewed indicates anything other than an official interest in the case.

The mere fact that the SJA was married to CDR A also fails to show that he had, or appeared to have, a personal interest in the case. Besides the fact that CDR A was steps removed from the prosecutors in the case and there is no indication she participated in the prosecution of the case, she was, by the time of arraignment, reassigned outside of the Legal Services Command. There is no indication that the SJA took or appeared to take a personal interest in the case based on his wife's attenuated role prior to arraignment, let alone that he had or appeared to have a lingering personal interest following her departure from that role.

Appellant has failed to make a showing either that the SJA had other than an official interest in the case or took any improper steps to influence the court-martial. We also discern no prejudice based on the SJA's participation. An objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceedings. We therefore conclude that the SJA's email and his marriage to CDR A neither disqualified him nor created an appearance of UCI.

## Special Findings

We next address the contention that the military judge's special findings inadequately addressed potential legal defenses to assault consummated by a battery.

Article 51(d), UCMJ, mandates that in a court-martial composed of a military judge alone, the military judge "shall make a general finding and shall in addition on request find the facts specially. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein." R.C.M. 918(b) amplifies, "In a trial by court-martial composed of military judge alone, the military judge shall make special findings upon request by any party. Special findings may be requested only as to matters of fact reasonably in issue as to an offense and need be made only as to offenses of which the accused was found guilty." The Discussion to the Rules notes, "Special findings ordinarily include findings as to the elements of the offenses of which the accused has been found guilty, and any affirmative defenses related thereto." Discussion, R.C.M. 918(b).

Because Article 51(d), UCMJ, was modeled after a Federal Rule of Criminal Procedure, "the federal civilian courts' experience with this type of statute will be most enlightening." *United States v. Gerard*, 11 M.J. 440, 441 (C.M.A. 1981). Special findings may be written or oral, R.C.M. 918(b), but "they must afford a basis for intelligent appellate review." *Gerard*, 11 M.J. at 443 (Everett, CJ, concurring) (quoting *United States v. Pinner*, 561 F.2d 1203, 1206 (5th Cir. 1977)). Special findings "primarily aid the defendant in preserving questions for appeal and aid the appellate court in delineating the factual bases on which the trial court's decision rested." *United States v. Livingston*, 459 F.2d 797, 798 (3d Cir. 1972).

Here, the trial defense counsel specifically requested findings "as to the elements of the offenses to which [Appellant] has been found guilty and any defenses thereto." App. Ex. 60 at 1. In response, the military judge issued special findings, correctly listing the elements of assault consummated by a battery and entering her findings that each was proven beyond a reasonable doubt. She also found, "The evidence did not support defenses of necessity, defense of another, or any other legal justification in striking [Seaman Kelch] on the head and body." App. Ex. 100 at 2. She explained that Appellant had stipulated as fact that at some point in his struggle with Seaman Kelch, Appellant became frustrated with him, straddled him and grabbed his jacket collar with his hands. Appellant then struck Seaman Kelch with his right hand at least two or three times in the face, arms, and torso. Therefore, the military judge concluded, Appellant had admitted to striking Seaman Kelch "out of frustration," and, "accordingly, a finding of any affirmative defense is not supported." *Id.*

Appellant posits that the military judge's special findings were inadequate because they failed to address whether the "touching was to attract another's attention or to prevent injury," a specific example of a situation not constituting battery, and because "more robust" discussion of the defense of necessity was required. Appellant's Br. at 36–37. We disagree. All that is required is that the military judge's findings address *factual* issues reasonably raised by the evidence such that we can be satisfied that she properly considered them, not that they address every possible permutation negating guilt or include a recitation of legal standards. Article 51(d), UCMJ ("If an opinion or memorandum of decision is filed, it will be sufficient if the *findings of fact* appear therein." (emphasis added); R.C.M. 918(b) ("Special findings may be requested only as to

22

*matters of fact reasonably in issue . . . .*") (emphasis added); *Livingston*, 459 F.2d at 798 (noting that special findings "aid the appellate court in delineating the *factual bases* on which the trial court's decision rested.") (emphasis added).

The military judge found that Appellant's striking of Seaman Kelch was not justified or excused by necessity, defense of another, or anything else. Basing this conclusion on Appellant's stipulated admissions was her prerogative as fact-finder. Appellant may wish she had expounded further and addressed evidence he believes is to the contrary, but that is not the purpose of special findings. They are sufficient to demonstrate to us that she properly considered defenses raised by the evidence and was convinced that they did not apply. Nor was the military judge required to address every example of situations not constituting battery. Her findings suffice to delineate the factual bases on which her decision rested and to afford us a basis for intelligent appellate review. That is all that is required.

### Post-Trial Delay

Appellant asserts that the 100 days between the convening authority's action—or, more accurately, her election *not* to take action—and docketing of the case with this Court was presumptively unreasonable under *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), and deprived him of his right to speedy post-trial review. We conclude that *Moreno*'s use of the convening authority's action as a terminal benchmark prior to docketing has been superseded by statute and regulation and that there was no presumptively unreasonable delay. Further, even under a full analysis, Appellant was not deprived of due process.

In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF), recognizing that "convicted servicemembers have a due process right to timely review and appeal of courts-martial convictions," established "a presumption of unreasonable delay that will serve to trigger the *Barker* four-factor analysis" when: (1) the action of the convening authority is not taken within 120 days of the completion of trial; (2) the record of trial is not docketed with the service CCA within thirty days of the convening authority's action; or (3) the CCA does not complete appellate review and render a decision within eighteen months of docketing. *Id*. at 135, 142.

The "*Barker* four-factor analysis" comprises consideration of the following four factors to determine whether post-trial delay constitutes a due process violation: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (citing *Barker v. Wingo,* 407 U.S. 514, 530 (1972)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136. If we conclude there was a due process violation, we must grant relief unless we are convinced beyond a reasonable doubt that the error is harmless. *United States v. Toohey*, 63 M.J. 353, 363 (C.A.A.F. 2006).

Following *Moreno*'s use of the convening authority's action as a key benchmark for post-trial processing, Congress passed the Military Justice Act of 2016 (MJA 2016).[16] This statute transforms a convening authority's action from a requirement that triggers our jurisdiction, Articles 60(c), 66(c), UCMJ (2016), to an *optional* step, in fact one that is *prohibited* except in specified circumstances. Article 60a, UCMJ. The case at bar is a classic example: the convening authority opted not to take action, so there *is no convening authority's action*—just a decision not to take action. MJA 2016 also removes the convening authority's action from its former status as "the terminal benchmark for post-trial processing," *United States v. Rivera*, 81 M.J. 741, 744 (N.-M. Ct. Crim. App. 2021), and instead makes it an optional (if not prohibited) step prior to final post-trial processing and entry of judgment. Article 60c, UCMJ.

The *MCM* (2019 ed.) implemented the MJA 2016 changes, providing for several changes to events in the post-trial timeline. First, the accused has only ten days after the date of sentence, with a possible extension for another twenty days, to submit matters to the convening authority.[17] R.C.M. 1106(d). As a practical matter, this is dramatically sooner in the process than under the old rules, where the time period for submissions by the accused began when the accused was served with the later of the authenticated record of trial (ROT) or the staff judge advocate's recommendation. R.C.M. 1105(c), *MCM* (2016 ed.).

---

[16] The alleged offenses in this case occurred after 1 January 2019, the date when the Military Justice Act of 2016 took effect, per E.O. 13825 (March 1, 2018).

[17] If a crime victim submits matters, which is governed by a like timeline, the accused would have five days to rebut that submission.

The next event is consideration by the convening authority as to whether any "action" is authorized, and if so, what action to take. *See* R.C.M. 1109 and R.C.M. 1110. At the conclusion of this consideration, the result is transmitted to the military judge. R.C.M. 1109(g), R.C.M. 1110(e). Next, the military judge "shall enter into the record of trial the judgment of the court." R.C.M. 1111(a)(1). This is to occur "as soon as practicable." R.C.M. 1111(e)(2). A court reporter prepares the record of trial according to R.C.M. 1112(b), which includes a recording of the proceedings but not a transcript, and certifies it "as soon as practicable" following entry of judgment, as required by R.C.M. 1112(c).

Before the certified record of trial is forwarded for appellate review, "a court reporter shall attach [certain materials] to the record." R.C.M. 1112(f). Included among those materials is a transcript, if required (as it is for the vast majority of cases before this court).[18] In the Coast Guard, after certification, the court reporter "will then send electronically the certified ROT with certified transcript to the military judge." Coast Guard Military Justice Manual (MJM) (COMDTINST M5810.1H) (9 Jul 2021) subsection 21.E.4.a. The military judge then "verifies" completeness of the record of trial. *Id.* (second 21.E.4.a).[19]

In short, whereas in the past the convening authority's action was the last event before a record of trial was forwarded for appellate review, in the new scheme the opportunity for the convening authority to take action is followed by the entry of judgment, which "terminates the trial proceedings and initiates the appellate process." R.C.M. 1111 (a)(2). And further administrative processing might take significant time, especially if the transcript was not yet completed.[20]

The CAAF itself has recognized that, though it has not yet had the opportunity to rule on the question, the amendments to the UCMJ and *MCM* "call into question the continued validity of the *Moreno* time lines." *United States v. Anderson*, No. 21-0179, 2022 WL 549111, n.2 at *2,

---

[18] A transcript is required for all cases eligible for review under Article 66(b)(1) or (3). *See* R.C.M. 1114(a)(1).

[19] These provisions are unchanged from the previous edition of the MJM.

[20] The Coast Guard MJM calls for the transcript to be completed within thirty days of adjournment of the court-martial. MJM subsection 21.E.5. That time standard was not met in this case.

(C.A.A.F. February 18, 2022). We now conclude that, at a minimum, the specific aspect of *Moreno* treating the convening authority's action as a terminal benchmark in post-trial processing has been superseded by these amendments. All three of our sister CCAs agree. *Rivera*, 81 M.J. at 745–6; *United States v. Brown*, 81 M.J. 507, 510 (Army Ct. Crim. App. 2021); *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020). We continue to be bound, however, by *Moreno*'s remaining standards, and we will continue to apply them to the extent feasible. Accordingly, we will apply a presumption of unreasonable delay triggering a full due-process analysis when: (1) the record of trial is not docketed with this Court within a combined total of 150 days of the completion of trial; or (2) we do not complete appellate review and render a decision within eighteen months of docketing.

Here, although more than thirty days elapsed between the convening authority's non-action and docketing with this Court, a total of only 146 days elapsed between completion of the trial and docketing. Accordingly, there was no presumptively unreasonable delay.

Alternatively, even if there was presumptively unreasonable delay, there still was no due process violation and relief is not warranted. The record shows the following sequence of post-trial events:

| Date | Event | Days elapsed |
|------|-------|:---:|
| 17 Sep 20 | Sentence adjudged | 0 |
| 3 Nov 20 | Convening Authority signed, taking no action | 46 |
| 10 Dec 20 | Entry of Judgment | 83 |
| 19 Dec 20 | Court reporter's certification of transcript | 92 |
| No date | Court reporter's certification of ROT | |
| 22 Dec 20 | Military Judge received ROT | 105 |
| 12 Jan 21 | Military Judge's verification | 126 |
| 11 Feb 21 | Docketing at CGCCA | 146 |

The length of the delay—100 days between the convening authority's non-action and docketing—favors Appellant, but there were many steps required and sound reasons for the delay under the restructured post-trial process of MJA 2016. Further, Appellant did not assert the right to speedy post-trial processing until filing his appellate brief, which weighs against him.

Also, importantly, Appellant has provided no evidence of cognizable prejudice as a result of the 100 days it took from convening authority's non-action to docketing, and we discern none—particularly in light of the case being docketed within the overall timeframe of 150 days envisioned by *Moreno*. Finally, there is no indication of dilatory processing or lack of institutional diligence, and relief is not warranted under Article 66(d)(2), UCMJ and *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). *Cf. United States v. Guzman,* 79 M.J. 856, 868 (C.G. Ct. Crim. App. 2020).

## Sentence Reassessment

Based on our action on the findings, we must determine whether we can reassess the sentence or whether a rehearing is necessary. We enjoy broad discretion in reassessing sentences. *United States v. Winckelmann,* 73 M.J. 11, 15 (C.A.A.F. 2013); *United States v. Hernandez*, 78 M.J. 643, 647 (C.G. Ct. Crim. App. 2018). But before we can reassess a sentence, we must be able to "reliably and confidently determine that, absent the error, the sentence would have been at least of a certain magnitude." *Hernandez*, 78 M.J. at 647 (citing *United States v. Buber,* 62 M.J. 476, 479 (C.A.A.F. 2006); *United States v. Harris,* 53 M.J. 86, 88 (C.A.A.F. 2000)). If we cannot do this, we must order a rehearing. *Harris,* 53 M.J. at 88. A reassessed sentence must not only "be purged of prejudicial error[,]" but "also must be 'appropriate' for the offense involved." *United States v. Sales,* 22 M.J. 305, 308 (C.M.A. 1986).

We apply the totality of the circumstances of each case to make sentence reassessment determinations, guided by the following "illustrative, but not dispositive, points of analysis":

(1) Whether there has been a dramatic change in the penalty landscape or exposure.

(2) Whether sentencing was by members or a military judge alone. We are more likely to be certain of what sentence a military judge would have imposed as opposed to members.

(3) Whether the remaining offenses capture the gravamen of criminal conduct included within the original offenses and, similarly, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

*Winckelmann,* 73 M.J. at 15–16.

Both parties ask that we reassess the sentence rather than authorize a rehearing. Under the totality of the circumstances, we conclude that we are able to do so. Because sentencing was by military judge, the sentence was "segmented," meaning it specified what, if any, confinement and/or fine was adjudged for each specification to which Appellant was found guilty. *See* R.C.M. 1002(d)(2)(A). The military judge adjudged the following confinement, to be served consecutively: eight months for the unenumerated Article 134 offense; four months for assault consummated by a battery; two months for false official statement; and none for underage drinking in violation of a general order. Reassessing the segmented portion of the sentence is simple, merely consisting of setting aside the eight months of confinement adjudged for the set-aside offense, leaving six months of adjudged confinement. *See United States v. Alkazahg*, 81 M.J. 764, 786 (N-M. Ct. Crim. App. 2021).

Reassessing the non-segmented (or "unitary") portion of the sentence—reduction to E-1 and a bad-conduct discharge—is not as simple. Although our action does not affect penalty *exposure*—a bad-conduct discharge and reduction to E-1 remain authorized for the remaining offenses—the unenumerated Article 134 offense undoubtedly was a dominating feature in the penalty *landscape*. The fact that it accounted for eight of fourteen months of combined adjudged confinement indicates it was the most serious among the offenses. But considering the remaining *Winckelmann* factors, particularly that sentencing was by military judge alone and that we have the experience and familiarity to reliably determine what sentence would have been imposed at trial for the remaining offenses, we determine that we can reassess the sentence.

Overall, we conclude that we can reliably and confidently determine only that, absent the error, the sentence would have been at least reduction to E-1 and confinement for six months. The remaining offenses are underage drinking in violation of a lawful general order, false official statement, and assault consummated by a battery. In our experience, underage drinking and false official statement do not generally merit a bad-conduct discharge. Nor does a non-aggravated assault consummated by a battery, absent particularly egregious circumstances. So the real question becomes whether Appellant's assault consummated by a battery of Seaman Kelch was

sufficiently egregious that we can be confident that a punitive discharge would have been imposed and is appropriate. This concededly is a close call for us, but we conclude it was not.

We first note that we do not believe it would be proper for us to consider evidence of Seaman Kelch's ultimate death. To be admissible, evidence in aggravation must directly relate to or result from the offenses to which the accused has been found guilty. R.C.M. 1101(b)(4). Not every consequence of an accused's actions is admissible in sentencing. *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995) ("[A]n accused is not responsible for a never-ending chain of causes and effects.") (internal quotation marks and citation omitted). A consequence must, instead, *directly* relate to or result from the offense, which imposes a higher standard than a showing of "mere relevance." *Id*. The evidence also must pass the balancing test under Military Rule of Evidence 403. *Id*. Applying that here, we conclude that Seaman Kelch's death, caused by drowning and hypothermia, was not directly related to or resulting from Appellant's earlier assault and therefore improper for our consideration as evidence in aggravation.

Still, significant aggravating circumstances remain. Seaman Kelch was incoherent, helpless, and in need of comfort and assistance when, instead, Appellant straddled and punched him, only stopping when Seaman T.H. intervened. Whatever frustration he may have been experiencing, this was inexcusable. But when we remove the notion that Appellant was criminally responsible for Seaman Kelch's death, what we are left with is a very drunk accused punching his very drunk friend after struggling to stop the friend from repeatedly rolling into dangerously cold surf. The evidence portrays this as a temporary lapse, albeit a serious one, born of frustration, not malice, from an otherwise sincere desire to save his friend and get him to safety. Given all these circumstances, we cannot be confident that a bad-conduct discharge would have been imposed.

Accordingly, we reassess the sentence to reduction to E-1 and confinement for six months.

**Decision**

The finding of guilty to Specification 2 of the Additional Charge is set aside and the specification dismissed with prejudice. Only so much of the sentence as provides for reduction to E-1 and confinement for six months is approved. We determine that the remaining findings and the reassessed sentence are correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the remaining findings of guilty and the sentence, as reassessed, are affirmed.

Chief Judge McCLELLAND and Judge HERMAN concur.



For the Court,


L. I. McClelland
Chief Judge